Bennie L. WHITFIELD, Douglas H. Fairbanks, Willie Yancy, Jr., George Curtis and James P. Mills, Plaintiffs,

v.

UNITED STEELWORKERS of America, Local No. 2708, Sheffield Steel Corporation and Claude Baldree (President of Steelworkers Union), Defendants.

Civ. A. No. 9838.

United States District Court
S. D. Texas,
Houston Division.

Nov. 20, 1957.

Dent, Ford, King & Wickliff, Houston, Tex. (Roberson L. King and Carl A. Williams, Jr.), Houston, Tex., for plaintiffs.

Dixie, Ryan & Schulman, Houston, Tex. (Chris Dixie), Houston, Tex., for defendant United Steelworkers of America, Local No. 2708.

Butler, Binion, Rice & Cook, Houston, Tex. (George W. Rice), Houston, Tex., for defendant Sheffield Steel Corp.

INGRAHAM, District Judge.

This is a class suit brought by five plaintiffs for themselves and others similarly situated for declaratory judgment, permanent injunction and damages. Plaintiffs are Negroes, members of the Local Union and employees of Sheffield. The class suit is for all Negro member employees.

Plaintiffs complain of the Agreement of May 31, 1956, amending the Seniority Provisions covering employees of Sheffield Steel, claiming that such Agreement discriminates against Negro member employees.

The evidence shows that Sheffield employs both white and Negro employees and that the membership of the Local Union is composed of both white and Negro members. An estimate of the membership of the Local Union is 1700 white members and 1300 Negro members. The percentage of Negro membership is considerably in excess of the percentage of Negro population in the area. All members have equal voting rights. The evidence shows that the Local Union has elected Negro officers in 1956 and in prior years. The Local Union is the bargaining agent. The Agreement of May 31, 1956, was adopted by the membership of the Local Union by a vote of 1,417 to 202.

The Agreement provides for separate lines of progression, classified as No. 1

Line of Progression and No. 2 Line of Progression, the No. 1 Line encompassing jobs classified as skilled labor. The No. 1 Line affords greater opportunity for advancement. Point 6 of the Agreement provides:

"6. The Company will give tests as follows:

"A. Any present employee not now in a No. 1 Line of Progression will be eligible to take the tests, if he so desires. All such employees shall notify the Company in writing of their desire to take the tests within twenty (20) days after date of acceptance of this Agreement and such employees will be given the tests within forty (40) days thereafter.

"B. Any employee hired hereafter will be required to take the tests.

"C. An employee who elects not to take the tests during the twenty (20) day period may request and take the test after the lapse of six months. An employee who fails to pass the tests may retake the tests after the lapse of six months.

"D. The content of all tests and the minimum passing grades will be determined solely by the Company. Upon request the results of an employee's tests will be open for inspection by the employee with or without the President or Chairman of the Plant Grievance Committee present, as he may elect."

Those desiring to transfer from a No. 2 Line to a No. 1 Line must not only satisfy the tests but, when qualified, must start at the bottom of the No. 1 Line grades, sometimes at a financial sacrifice.

Tests for No. 1 Line of Progression are available to white and Negro alike. From the evidence, 317 Negroes have taken the tests, 90 Negroes have made qualifying grades and 45 Negroes have actually moved into No. 1 Line positions. None of the nominal plaintiffs or their witnesses, all Negroes, has taken the tests. Each admitted that the tests were available to him.

Plaintiffs offered no evidence of damages.

The rules apply to Negro and white alike. Evidence of discrimination is not convincing.

The following are filed as Findings of Fact and Conclusions of Law:

### Findings of Fact

#### a. *The Parties*

1. The five individual plaintiffs are Negro citizens of the United States and of the State of Texas. They purport to sue on behalf of themselves and other; persons similarly situated, that is, on behalf of all Negro citizens who are employees of the defendant Sheffield.

Plaintiffs are members of the defendant Local Union 2708, which is affiliated with the United Steelworkers of America AFL-CIO. Likewise, the Negro citizens whom plaintiffs allege they represent are members of said Local Union No. 2708.

2. The defendant Armco Steel Corporation is an Ohio corporation. It commenced the operation of the steel mill at Houston, Texas, on July 1, 1954. In its Houston operations it is now known as Sheffield Division Armco Steel Corporation. The original operator of the steel mill in question was the Sheffield Steel Corporation of Texas, a Texas corporation which was incorporated in the year 1941, and was dissolved on July 1, 1943. On July 1, 1943, the plant commenced operations by the American Rolling Mill Company, an Ohio corporation. Such operations continued until January 1, 1946, when the operation of the plant was taken over by Sheffield Steel Corporation, an Ohio corporation. On July 1, 1954, Sheffield Steel Corporation was dissolved and the operation was taken over by the defendant Armco Steel Corporation. The corporate defendants will, for convenience, be referred to simply as "Sheffield" or the "Company".

3. Defendant Local No. 2708 of the United Steelworkers of America AFL-CIO is the exclusive bargaining agent of all production and maintenance employees at the Houston Plant of the defendant Armco Steel Corporation, except

those who are excluded from the bargaining unit by the collective bargaining agreement of November 29, 1956.

In the year 1942 in Case No. 16–R–488, United Steel Workers of America CIO was certified by the National Labor Relations Board as the exclusive collective bargaining agent for employees at the Sheffield Steel Corporation of Texas. There was a further certification of the same Union in the year 1945 in Case No. 16–R–1233 for 25 additional employees. Local 2708 is a subordinate organization of the United Steel Workers of America.

Although there has been no further formal certification of the Union, Local 2708 has been, throughout the years, recognized by the various corporate employers as the exclusive bargaining agent for the employees in question. At all times in this litigation Local 2708 has admitted for itself that it is under a duty to discharge its duties in conformity with the Constitution, laws and public policy of the United States, and has rested its defenses upon the ground that it has done so in all respects.

Defendant, United Steelworkers of America, Local 2708, will, for convenience, sometimes be referred to as the "Union".

### b. *Jurisdiction*

4. The jurisdiction of the court arises under Title 28 United States Code, § 1331, being brought as a suit under the Constitution and laws of the United States, to-wit: the Fifth Amendment to the Constitution and Title 29 United States Code Annotated § 159, more commonly known as The National Labor Relations Act, as amended, with requisite jurisdictional amount in controversy.

### c. *History of Local 2708*

5. There are approximately 3,000 employees in the production and maintenance unit who are represented by Local 2708. Of this number approximately 1,700 are white employees and 1,300 are Negro employees. Under the laws of the State of Texas, a Union shop may not be authorized by The National Labor Relations Act and has never been in effect at the Houston Plant, and all Union membership has been voluntary. However, practically 100 per cent of all employees are members of Local 2708.

6. At all times, defendant Local 2708 has been a completely integrated local. Full membership has been available regardless of race and without qualification. The Negro employees have taken full advantage of these membership rights throughout the years by full and active participation in the affairs of the Union, and in bargaining with their employer and in the execution of all contracts and agreements. The collective bargaining contracts have been negotiated and signed by negotiating committees which at all times included members of the Negro race. The various lines of progression which are involved in this suit have been negotiated in past years with the full and active participation of Negro employees acting in their capacity as Union officers and have often been formally executed by them.

In the exercise of their rights of franchise within the Union, the employees have frequently elected Negro members to Union offices, and in particular, the office of Plant Grievance Chairman, a key position in the negotiation and administration of the labor contract has been held by a Union member of the Negro race consecutively from 1948 until the date of trial, with the exception of one two-year term.

The record abundantly establishes that at all times in the past the Negro employees have actively and effectively participated in all features of the collective bargaining process, and that the existing collective bargaining contracts and lines of progression were established and maintained by their active participation, procurement and consent, except insofar as the named plaintiffs now object to certain features of the Agreement of May 31, 1956.

### d. *The Alleged Cause of Action*

7. It was stipulated by the parties at the trial, and it has been made explicit by the parties in their briefs, that this

suit for injunction, declaratory judgment and damages has been brought to establish the invalidity of a certain agreement dated May 31, 1956.

Specifically, plaintiffs have claimed in their brief before the court that the Agreement of May 31, 1956, is discriminatory and invalid for two reasons: (1) It subjects Negro employees in the plant to qualifying tests as a condition for promotion to certain jobs in the plant; and (2) It subjects many Negro employees to suffer a reduction in wages and a loss of seniority previously accrued in a department as a condition of promotion. These conditions plaintiffs claim are applicable to Negro employees if they desire to promote from the Company's No. 2 Lines of Progression into the No. 1 Lines of Progression.

For the reasons hereinafter set out, the court finds and concludes that plaintiffs' claims are factually unsound. The provisions which are claimed to be discriminatory actually apply equally to all employees and are based in every case upon relevant and compelling reasons of efficiency of operation.

e. *Background Prior to May 31st Agreement*

8. Over the years, the collective bargaining agreements with the Union covering the employees in the bargaining unit in question have been master contracts, that is they have covered the operations of the employer in many plants throughout the United States.

Such agreements, which are common to the steel industry, have provided that at each local plant seniority units would be established within a department or within any subdivision thereof.

Pursuant to such contractual agreement, the Houston Plant established two or more lines of progression within each department, each line constituting a seniority unit.

9. The Sheffield Plant at Houston, Texas, commenced operations in about April, 1942. On February 23, 1943, the Union was recognized as the collective bargaining agent for all production and maintenance employees of Sheffield at the Houston Plant, with immaterial exceptions, and the first collective bargaining contract between the Company and the Union was executed on that date.

10. Prior to the execution of the first collective bargaining agreement on February 23, 1943, the Company had the uncontrolled right of selectivity in its employment of persons and in the designation of the jobs and the duties which such employees would perform. During the period prior to February 23, 1943, the Company employed white persons to perform the skilled jobs and employed Negroes to perform common labor and unskilled jobs. In doing so, the Company followed the prevailing custom in this area and during such period the only available supply of skilled workers was from the white group.

11. During the period commencing about January 1, 1942, and ending in November, 1946, by reason of Federal law and regulation governing the use of manpower, the Company could only hire employees furnished to it by the United States Employment Service and approved and cleared through that agency. During such period USES furnished the Company white skilled employees and Negro common labor and unskilled employees.

12. When United States Employment Service was discontinued in November, 1946, the Texas Employment Agency, a branch of the Texas State Government, began furnishing Sheffield with persons seeking employment and continued the practice of furnishing white applicants for skilled employment and Negro applicants for common labor and unskilled work.

13. Continuously during the period from February, 1943, to date, Negro employees in responsible positions and offices in the Union have participated in the negotiation of the bargaining contracts, progression charts, grievances and similar proceedings and have joined in the execution of the contracts and writings entered into between the Company and the Union.

## 434

14. Prior to November, 1954, the Negroes affirmatively approved and agreed to the promotion and progression practices and other practices in effect in connection with the filling of the jobs in the bargaining unit at the Sheffield Plant. During all of this period, the Negroes signified complete agreement to all such practices and did not object, protest or evidence any dissatisfaction.

15. Each line of progression has constituted a series of logically interrelated jobs. The bottom job of each required the least skill, experience and potential ability. Each job successively requires increased skill, experience and ability. Such lines of progression have been negotiated and agreed to in writing between the Company and the Union at various times in the history of the plant.

Throughout the years, the skilled jobs within a department have been logically grouped together in one or more lines of progression. On the other hand, the unskilled jobs and those requiring minimum skills have been logically arranged within one or more separate lines of progression. The skilled lines of progression have been uniformly denominated as No. 1 Lines of Progression, and the unskilled as No. 2 Lines of Progression.

In the staffing history of the plant, above related, the No. 1 Lines were occupied by white employees and the No. 2 Lines by Negro employees.

In formalizing these Lines of Progression into signed agreements over the years, the Negro employees, as above stated, participated in their designing and formal execution.

16. For the first time, in November 1954, Negro employees at the Sheffield Plant expressed dissatisfaction with respect to the failure to permit them to transfer from the No. 2 Lines of Progression into the No. 1 Lines of Progression.

17. Promptly after the communication to the Company of this first expression of dissatisfaction, negotiations were commenced between the Company and the Union for the purpose of considering the grounds of dissatisfaction expressed by the Negroes as well as changes desired by them, including particularly a proper basis for permitting Negroes to enter No. 1 Lines of Progression.

18. These negotiations were conducted between Company representatives and a Joint Union Seniority Committee composed of two Negro representatives and two white representatives, together with proper Union officials. These negotiations culminated in the formulation of the May 31st Agreement and such negotiations were conducted openly, fairly and in good faith by all parties. These negotiations lasted for a period of about one year during which time all representatives were free to and did express their views and ideas.

19. The Negro representatives on the Joint Union Seniority Committee objected to some of the provisions of the proposal of the Company which later constituted the May 31st Agreement and submitted their counter-proposal of May 10th which sets forth the agreement desired by them. Because of this difference of opinion, these Negro representatives opposed the ratification of the May 31st Agreement by the Union membership.

20. The May 31st Agreement was submitted to the vote of the Union membership with the result that in the Union ratification meetings of May 24th and May 25th, 1,412 Union members voted in favor of the agreement and 202 voted against it. On those dates there were between 1,250 and 1,300 Negroes who were members of the Union and eligible to vote at these ratification meetings, but the vast majority of them elected not to vote either to approve or disapprove the May 31st Agreement.

### f. Lines of Progression

21. As stated above, operations at the Sheffield Plant are divided into departments which in turn are subdivided into Lines of Progression. Each Line of Progression covers a definite and particular branch or phase of the operations, and consists of logically interrelated series of jobs beginning with a bottom

job, which requires the least skill, training and experience and ascends in a logical step-by-step progression to the top job, which requires the greatest skill, training and experience in the particular phase of operations covered by that line of progression.

22. In negotiating Lines of Progression, the Company has insisted upon and obtained an arrangement of jobs which are logically interrelated with each other in the mechanical operations of the plant. The Company has not and would not agree to any other type of Line of Progression except one so based upon the interrelation of the jobs.

23. A job vacancy or opening in a Line of Progression is filled by promoting, on the basis of seniority within that line, the man who occupies the job immediately below the vacancy with the result that a vacancy in a job high in the line operates to advance each man lower in the line one step upward. This progression or promotion system leaves the ultimate vacancy at the bottom of the line.

24. Efficient and prudent operations require the progression and promotional system which is carried out in the Lines of Progression. The training, experience and skill which a man obtains in the bottom job of a Line is a prudent and good faith prerequisite to his advancing to the next higher job in the Line.

25. Similarly, the training, experience and skill which a man obtains in every other job or step in a Line is a prudent and good faith prerequisite to his advancement to the next higher job in the Line. The requirement that a man fill each such job in order to qualify him for the next higher job is motivated by good faith and sound judgment and is not motivated by bad faith or discrimination of any sort.

26. The requirement that a man shall promote in a Line of Progression on the basis of his seniority within that Line is a good faith and prudent business requirement and is not motivated by bad faith or discrimination. Otherwise, if a man is promoted in a particular Line on the basis of seniority acquired elsewhere, promotion would be on the basis of factors and experience unrelated and irrelevant to the work and skills required for the particular promotion. Without this requirement there is no assurance that when a man enters a Line, he will work in each job in the series that constitute such Line and thereby acquire the skill, training and experience essential for promotions and essential for sound business operations. If a man were permitted to use an extraneous seniority to promote within a Line of Progression, he might well skip rapidly into the high job in the Line and override employees whose occupancy in the Line and whose necessary accumulated skill, training and experience in these related jobs is vastly greater.

Moreover, this would deprive the Company of the safeguard which is properly a condition to the Company agreement to any system of promotions based on seniority and that is, the requirement of a step-by-step accumulation of skill, training and experience as a prerequisite to promotion.

27. All of the aspects of Lines of Progression as they are now in operation at the Sheffield Plant—including the make-up of these Lines, the jobs contained therein, the interrelationship of such jobs, promotions into and within such Lines, the requirement that an employee entering a Line begin at the bottom or starting job, the requirement that promotions be based upon seniority within a Line—are actuated by good faith and prudent business management and are not motivated or tainted by bad faith or racial discrimination. To eliminate any of these aspects would decrease efficiency and would result in great harm and disadvantages to both the Company and its employees, white and Negro.

28. Prior to the May 31st Agreement, Sheffield had the prerogative to hire any employee it desired to fill the bottom or starting jobs in the No. 1 Lines whenever a vacancy occurred. It filled each such bottom job with employees that it determined had (1) the ability to per-

form the particular bottom job opening, and (2) had the potential to advance up the line and fill all jobs to and including the highest job in the line. The Company filled the bottom job by interviewing applicants, investigating such applicants with prior employers and references furnished by applicants, appraising and screening such applicants which process was conducted by the Company's employment supervisor and by the superintendent of the department in which the job opening existed. Finally, the applicant who was employed in the bottom job on any No. 1 Line had to undergo an initial 260-hour probationary period during which time the Company could observe and carefully study and review the man's work, ability and potential for advancement. If for any reason the Company was not entirely satisfied with the employee hired to take a bottom job in a No. 1 Line during this 260-hour probationary period, the Company had the uncontrolled right to discharge such man and neither the man nor the Union could question the Company's decision, file any grievance or resort to any arbitration based thereon.

29. Accordingly, prior to the May 31, 1956, Agreement in the No. 1 Lines of Progression, the bottom job has always been a starting job. That is, in the filling of such bottom job, the Company hired new employees, whom it selected in its sole discretion, subject to its own standards. At no time has any employee had any right to bid on such a starting job upon the basis of his seniority or otherwise. At no time has the Union had the right by means of closed shop, union shop or any hiring practice to specify or recommend what person should fill such a job, or what his qualifications should be.

30. The only exception to the foregoing practice of hiring new employees has been the infrequent occasions when the Company allowed an employee to "transfer" from one department to another. In such a case, however, the Company still had unlimited discretion to permit or not permit such a transfer from one department to another. In such a case the transferred employee took no seniority with him. This has always applied to the transfer of a white employee from one Line of Progression to another.

31. In agreeing and contracting to promote within a Line of Progression, the Company has agreed to promote by seniority within that Line of Progression. The agreement of the Company, however, has been based upon its free and unfettered right to establish qualifications and make original selection in the first instance. In its hiring practices the Company has not hired an employee solely for his ability to perform the bottom job, but to the contrary, the selection has been based upon the potential ability of the employee to promote successfully to the highest job, thereby providing the Company with a pool of competent manpower adequate to its operational needs. Furthermore, the reason for promotion by seniority within a Line of Progression has been to insure the full development of each employee in each successive job in the Line of Progression, thereby assuring to the Company that the employee will develop maximum experience and know-how within the particular phase of operation before moving upward to the next job. Accordingly, the Company has not and would not agree to promotions based upon seniority in some other Line of Progression, since to do so would promote employees without reference to their experience, development and know-how within a particular phase of the operation. The record establishes that the employer's operation is an integrated steel mill of many different departments and Lines of Progression, as a result of which experience on some Line of Progression or department has little or no relation to the experience needed within a particular Line of Progression.

32. Accordingly, no employee of any race has been allowed to bid into any Line of Progression at any point above the bottom job, and no employee of any race has been allowed to be promoted

out of line of his seniority in that particular Line of Progression.

33. Before 1949 exactly the same rules applied as above stated, and these rules applied to both the No. 2 Lines of Progression and the No. 1 Lines of Progression. In 1949, however, the Union, acting principally through the then Chairman of the Grievance Committee, a member of the Negro race, persuaded the Company to agree to tie in all of the No. 2 Lines of Progression at the bottom with the so-called "labor department or labor pool". Under this 1949 arrangement Negro employees were hired into the labor department and then bid into the bottom jobs of the No. 2 Lines of Progression by seniority. Conversely, if there were a layoff in any No. 2 Line of Progression, the employees instead of losing their jobs altogether were admitted back into the labor department, thereby retaining a job if they had plant-wide seniority over some other employee in the labor department. The 1949 arrangement offered certain advantages to the then occupants of the No. 2 Lines of Progression, who were Negroes, because it gave them a cushion of jobs to fall back on in case of layoffs. By contrast, the then occupants of the No. 1 Lines of Progression had no tie-in at the bottom with any other department or pool. Consequently if a lay-off occurred in any No. 1 Line of Progression, it was possible and frequently happened that an employee was laid off and had no job at all, while in some other department an employee junior to him on a plant-wide basis was still at work.

34. The then occupants of the No. 1 Lines of Progression on being laid off were sometimes listed on the so-called "Extra Board", which was nothing more than a list of names from which an employee could be assigned a day's work here and there, if any work was available.

35. The May 31, 1956, Agreement abolished the "Extra Board". It provides that all employees of any race shall be hired into the labor pool. There is only one starting job, and there is no distinction in wage or required qualifications on account of race.

### g. The May 31st Agreement

36. The May 31st Agreement provides that if the bottom job in any No. 1 Line becomes vacant, the Company must fill this vacancy first by subjecting the job to the bid of a man in the No. 2 Line of Progression in the same department, if there be any such man who has passed the qualifying test. If there be no man in a No. 2 Line in the same department who has passed the qualifying test, the Company is compelled to fill the opening job in a No. 1 Line with a man in the Labor Department who has passed the test. Under the May 31st Agreement, the first preferential right to demand and receive any open starting job in a No. 1 Line of Progression rests with the qualified employees who are then in a No. 2 Line of Progression in the same department and the second such preferential right rests with the qualified men in the Labor Department. If any man with such preferential right demands the job, the Company cannot deprive him of it. Such man having passed the qualifying test is not subject to any further investigation, screening or appraisal for the purpose of determining his potential to advance in the No. 1 Line of Progression although, of course, he must have the physical fitness and ability to perform the job opened. Further, such man is not required to undergo any probationary period during which the Company has any right to either discharge the man or to demote him.

37. Upon the effective date of the May 31st Agreement, all jobs in No. 2 Lines of Progression and in the Labor Department of the Sheffield Plant were filled by Negroes. The May 31st Agreement operates to vest in such Negro employees who pass the test the preferential right to fill future openings in No. 1 Lines of Progression.

38. The Lines of Progression have been set up in good faith, in accordance with sound and prudent business management, and are appropriate for the efficient operation of a steel mill. They

were not motivated by bad faith or racial discrimination. It is true that prior to the May 31st Agreement only white employees staffed the No. 1 Lines and Negro employees staffed the No. 2 Lines. The No. 1 Lines involved the performance of skilled work in the production and maintenance departments of the Company and the No. 2 Lines involved the performance either of unskilled work or work requiring a minimum degree of skill. Since the May 31st Agreement there is no racial distinction or discrimination in the No. 2 and No. 1 Lines but all such Lines are now being staffed indiscriminately with both white and Negro employees. The fact that prior to the May 31st Agreement No. 2 Lines were staffed by Negroes does not present any basis for eliminating No. 2 Lines since the true basis for the existence of the No. 2 Lines is to provide a proper, prudent and sound sub-departmentalization of the operations of the steel plant regardless of whether the employees in such Line consist wholly of Negroes, wholly of whites or both races indiscriminately.

39. The May 31st Agreement, in providing preferential rights for employees in the No. 2 Lines and in the Labor Department to fill starting job openings in No. 1 Lines, requires that the employee first pass a test. This test requirement supersedes and wholly supplants the right, prior to the May 31st Agreement, of the Company to pick and choose, interview, screen, appraise and subject to a 260-hour probationary period the employee who fills the starting job.

40. During the negotiations for the May 31st Agreement, the Company originally requested that it retain its right of selectivity by having the right of selection from among the employees in the plant to fill the bottom jobs in the No. 1 Lines of Progression. This position and request were strenuously objected to by the Union, including particularly the Negro members of the negotiating committee, on the ground that the right of selection under such circumstances would give the Company an opportunity to practice favoritism. Such position was maintained not only during the negotiations but at the trial.

41. The Company eventually surrendered its original right of selection, accepting in lieu thereof the uniform qualifying test. Under such substitute arrangement, the Company was compelled to fill the bottom job by seniority, provided the uniform qualification test was passed.

42. During the negotiations for the May 31st, 1956, Agreement, the Union bargained for and obtained substantial concessions from the Company concerning the uniformity and fairness of the Company test, and provided adequate machinery to check the examination results, thereby assuring all employees equal and fair treatment.

43. The examinations accepted by the Company and administered to the employees are tests in wide commercial usage, and are scientifically designed to reveal the potentiality of the employee to promote to the highest skilled jobs in the plant. The examinations are a fair and reasonable substitution of the Company's right to an original selection. No question was raised at the trial in regard to the fairness with which the tests were administered. The record reveals that approximately 90 Negro employees have passed the examinations and approximately 45 have moved into the bottom jobs of a No. 1 Line of Progression. The other 45 constitute a reservoir of qualified employees to move into the No. 1 Line of Progression as and when the bottom jobs open. This number has qualified themselves in spite of the fact that most of the Negro employees in the plant have declined the invitation to take the examination. Several Negro witnesses at the trial testified that they declined to take the examination as a matter of principle or for personal reasons, and there is substantial evidence in the record from which the court concludes that there has been voluntary refusal to take the examination on the part of most of the Negro employees, apparently in reliance upon this litiga-

tion as a means by which such requirement will be dispensed with.

44. The requirement of the test in order to qualify for employment in the No. 1 Lines is a good faith, prudent business requirement and is not motivated by bad faith or discrimination in any form.

45. Operating efficiency demands that an employee who enters a No. 1 Line have not only the ability to perform the bottom job in the Line but the potential to advance in the Line and to fill the highest job therein. If employees enter No. 1 Lines and do not have the ability to progress in such Lines, the operations will be seriously handicapped because of unavailability of employees to take the top skilled jobs.

46. The test requirement is the minimum assurance with which the Company can operate with efficiency.

47. The Negro representatives on the Joint Seniority Committee which conducted negotiations leading to the formulation of this agreement did not object to or oppose the inclusion in such agreement of the test requirement. There is no ground or basis upon which to condemn the test requirement and to do so would require a finding of bad faith not only on the part of the Company and the Union, but also the Negro representatives who were specifically carrying out the representation of the Negro employees and there are no facts upon which to predicate bad faith on the part of any of these parties.

48. All white employees must take the same test in order to enter the bottom job of any No. 1 Line of Progression and this is so whether they are new employees or old employees, the examination is uniform and fair and applies to all.

49. Plaintiffs' objection that there is discrimination in the failure of the May 31st Agreement to require incumbents in a No. 1 Line to pass the test as a prerequisite to promotion in their own Lines has not been supported by the evidence.

50. The No. 1 Line incumbents have been screened, tested, appraised and subjected to a 260-hour probationary period which is a good faith and prudent assurance of their potential to advance in such Lines.

51. The Negro representatives on the Joint Union Seniority Committee objected to the Company's continuance of its practices with respect to such selection, screening and probation in filling starting No. 1 Line jobs and agreed to the present qualifying tests as being less onerous to the employees.

52. The adoption by the Company of the testing procedures as a more modern and accurate gauge of an employee's potentiality was under consideration by it before the issues in the present case arose. The Company, in the exercise of its discretion in hiring unilaterally, installed the tests for new employees before the negotiation of the May 31st Agreement.

53. The claim that Negro employees who qualify are discriminated against because they are compelled to bid in at the bottom job of a No. 1 Line of Progression is without foundation in fact. This will occur in a relatively few instances only, and applies equally to the members of both races.

54. Furthermore, if any employee could be said to be dissuaded by his drop in pay, the job then falls to the bid of another Negro employee. Therefore, the court finds that it is not true that the purpose of the arrangement is to discourage employees on account of their race, especially in view of the excellent history of both the Union and the Company in the matter of protection of Negro employees' rights.

## Conclusions of Law

I conclude:

1. The May 31st Agreement and the Lines of Progression now in effect at the Sheffield Plant do not violate any constitutional or statutory provision, constitute the good faith exercise of the functions, powers and authorities of Sheffield and of the Union, are not in any way

motivated by or tainted with any bad faith or racial discrimination, and are in all respects lawful.

2. Every feature of the May 31st Agreement has its foundation on essentially "relevant" factors as defined by the Supreme Court of the United States [1] and the United States Court of Appeals for the Fifth Circuit.[2]

3. Defendants are not guilty of any wrongful or actionable conduct toward plaintiffs.

4. Plaintiffs are not entitled to any of the relief sought by their Complaint.

True copies hereof will be forwarded by the clerk to counsel of record, who will draft and submit Judgment accordingly.

1. Steele v. Louisville & Nashville R. Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L. Ed. 173; Ford Motor Co. v. Huffman, 1953, 345 U.S. 330, 73 S.Ct. 681, 97 L. Ed. 1048; Syres v. Oil Workers International Union, 1955, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785.

2. Pellicer v. Brotherhood of Railway & Steamship Clerks, 1954, 217 F.2d 205.