**John TAYLOR et al., Plaintiffs,**

**Alfred James et al., Intervenors,**

v.

**ARMCO STEEL CORPORATION et al., Defendants.**

**Civ. A. No. 68–H–129.**

United States District Court,
S. D. Texas,
Houston Division.

Sept. 14, 1973.

Mandell & Wright (Arthur J. Mandell), McDonald & McDonald (Gabrielle K. McDonald), Houston, Tex., for plaintiffs & intervenors.

Butler, Binion, Rice, Cook & Knapp (George W. Rice), Houston, Tex., Dixie, Wolf & Hall (Chris Dixie), Houston, Tex., for defendants.

## MEMORANDUM AND ORDER

SEALS, District Judge.

### PREFACE

"As a man is said to have a right to his property, he may be equally said to have a property in his rights * * * * If the United States mean to obtain or deserve the full praise due to wise and just governments, they will equally respect the rights of property, and the property in rights." James Madison, in the National Gazette, March 29, 1792.

### BACKGROUND

This is a class action suit under Rule 23(b)(2), F.R.Civ.P., by and on behalf of certain black employees of Armco Steel against their employer and their collective bargaining representative, United Steelworkers of America, AFL–CIO, Local 2708, and its parent organization, the United Steelworkers of America, AFL–CIO, for alleged racial discrimination in the seniority and promotion/demotion systems at the Armco plant in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq. The Court has jurisdiction of the parties and subject matter. 28 U.S.C. §§ 1331, 1343(4) and 42 U.S.C. § 2000e–5(f).

The Plaintiffs and Plaintiff-Intervenors will be referred to collectively as

"the Plaintiffs" or will be identified by their surnames where appropriate. The Defendants will be referred to as "Armco," "the International" and "the Local." The Defendant Armco is an employer within the meaning of 42 U.S.C. § 2000e(b). The Defendant International and the Defendant Local are labor organizations within the meaning of 42 U.S.C. § 2000e(d) and (e).

Armco operates a basic steel mill at Houston, Texas, which employs 3,635 persons in production and maintenance jobs. Of these employees, 1,155 are black and 2,480 are white. The majority work in departments which are not involved in this suit. The plant itself is diamond shaped and located east of Houston on about 800 acres.

Operations began in 1942 under a predecessor corporation. Since that time the Local has served as the exclusive collective bargaining agent for the production and maintenance workers both black and white. See, Whitfield v. United Steelworkers of America, Local 2708, 156 F.Supp. 430 (S.D.Tex.1957), aff'd 263 F.2d 546 (5th Cir. 1959). At the Houston Works, Armco makes steel billets and steel blooms from raw materials for shipment to customers and for its own use. The steel which Armco retains is then further refined and shaped into "finished steel products," such as bars, angles, rounds, plates, and beams, for industrial use by its customers. The production functions have been assigned to various departments, and within some departments Armco has established lines of progression for the jobs which it regards as "skilled," or trade and craft, (Line 1), and the jobs which it regards as "unskilled," or labor, (Line 2).

Originally, the functions now performed by Lines 1 and 2 were performed by segregated lines. From the time the Houston Works opened in 1942 until May 31, 1956, all whites were hired into the trade and craft line and all blacks were hired into the labor line. On that date Armco and the Local signed a local working agreement (Appendix A, Pltf. Ex. 22) which eliminated the segregated

hiring practices and permitted Line 2 employees to transfer to Line 1 on the basis of their Line 2 seniority after passing a test. The test requirement was waived by Armco as a precondition to transfer by a local agreement effective May 1, 1964. Accrued Line 2 seniority could not be used for advancement or retention in Line 1 under the 1956 agreement, but could be used for retention in Line 2 in the event of a reduction in forces. A so-called "extra board" for employees bumped out of the white (now No. 1) line was eliminated. Under the agreement *all* newly hired personnel, except apprentices, were sent initially to a labor pool from which they were assigned temporary jobs on a daily basis in any department or line including Lines 1 when no Line 1 or "test-qualified" Line 2 employee took the openings. Eventually, new personnel hired in this manner could bid on the starting job in any department or line and thereby receive a permanent position.

In this suit, the Plaintiffs allege that the seniority and transfer system in force at Armco when Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, became effective on July 2, 1964, was racially discriminatory and therefore unlawful. The Plaintiffs allege that the system in existence on that date carried forward past discriminatory policies and penalized black employees on account of their race by depriving them of an equal opportunity to transfer and to promote to better quality, higher paying jobs, and to retain their jobs in the event of a layoff. In particular, it was alleged that the blacks were denied equal opportunity in that:

(1) Prior to May 31, 1956, employees were segregated by race into white and black lines in each department and blacks were hired only for lower paying "labor" jobs;

(2) Blacks hired prior to May 31, 1956, and blacks hired after that date and channelled into Line 2, were not permitted to transfer to Line 1 until they had taken and passed a test; this

permitted Line 1 employees to stay ahead of both black groups since the test was not required for retention in the line;

(3) The operation of the agreement of May 31, 1956, permitted persons hired into the labor pool after May 31, 1956, to by-pass black Line 2 workers with greater departmental service who had not taken and passed the test, and to enter Line 1 ahead of them;

(4) After May 31, 1956, black Line 2 employees who did transfer to Line 1 had to enter Line 1 at the starting job in that line, often at a reduced rate of pay;

(5) After May 31, 1956, black employees who transferred from Line 2 to Line 1 could not use Line 2 seniority for advancement or retention in that line, but could only use Line 1 seniority which began to accrue only after receiving a permanent assignment in that line; as a result less-senior white employees in Line 1, who held higher jobs as a result of either the segregated hiring or the test requirement, were guaranteed their position ahead of the black transferees;

(6) Under the May 31, 1956, agreement Line 2 employees who filled temporary vacancies in Line 1 could not count that service towards their Line 1 seniority;

(7) Black employees were discriminated against by an agreement of August 9, 1966, which permitted jobs in the reorganized Structural Mill to be re-bid upon the basis of Line 1 seniority and not "departmental seniority" (Line 1 and Line 2 service combined) as previously agreed.

The Defendants agreed that prior to May 31, 1956, employment at Armco's Houston Works had been segregated, but denied that the May 31, 1956, agreement was racially motivated and denied that it had operated to effect a denial of employment opportunity on account of race. Similarly, the Defendants denied that either the dual-line progression system or rebidding of the Structural Mill was racially discriminatory in motivation or effect.

By way of relief the Plaintiffs sought merger of the dual lines of progression in those departments where such lines still existed,[1] a reorganization of the seniority system which would credit employees for continuous service on a "departmental" as opposed to a "line" basis, rebidding of jobs, and back pay. It was agreed that the issues of liability and remedy would be tried separately in an attempt to simplify matters. The only matter under consideration here is the liability, if any, of these defendants; although the decision on liability will have an effect on the scope of the remedy.

By memorandum opinion of January 6, 1973, modified February 20, 1973, this Court determined that this suit could be properly maintained as a class action under Rule 23(b)(2), F.R.Civ.P. That determination is reaffirmed here. As defined, the "class" on whose behalf relief is sought consists of:

"All black employees at the Armco Steel Houston Plant hired into the black, or No. 2, Line prior to May 31, 1956; and all those black employees hired into the No. 2 Line whether before or after May 31, 1956, who were prevented or inhibited from transferring to the No. 1 line because of a required test and a requirement that Line 2 seniority could not be used for advancement or retention in Line 1, and who after May 1, 1964, were prevented or inhibited from transferring to Line 1 because Line 2 seniority could not be used for advancement or retention in Line 1; and all

[1]. The departments at issue here are: (a) Structural Mill; (b) the Electric Furnace, or Melt Shops, formerly part of the Open Hearth; (c) Blooming Mill; (d) Plate Mill; (e) Merchant Mill; (f) Rod Mill; (g) Wire Mill; (h) Nail Mill; (i) Shipping Department; (j) Blast Furnace; (k) Coke Plant; (1) Sintering and Ore Bed Plant; (m) Roll Shop. The Rod Mill, Wire Mill and the Nail Mill have closed since May 31, 1956. The Sintering and Ore Bedding Department was established as a new department after that date. It had formerly been part of the Blast Furnace.

those black Line 2 employees who transferred into Line 1 after May 31, 1956, and have been unable to use their Line 2 seniority for advancement in Line 1." Memorandum and Order, February 20, 1973, p. 2.

The rights, duties and liabilities of the parties will be discussed in the context set forth above. The first issue is *res judicata*.

## THE WHITFIELD CASE, RES JUDICATA, AND TITLE VII

The Defendants argue that the maintenance of this lawsuit and the relief requested by the Plaintiffs are barred by the principles of *res judicata* and collateral estoppel, citing Oklahoma v. Texas, 256 U.S. 70 at 85, 41 S.Ct. 420, at 422, 65 L.Ed. 831 at 834 (1921), to the effect that a question of law or fact previously put in issue and finally determined by a court of competent jurisdiction cannot thereafter be litigated between the same parties or their privies whether the second suit be for the same or a different cause of action. The suit which Defendants set up in bar is Whitfield v. United Steelworkers, 156 F.Supp. 430 (S.D. Tex.1957) aff'd 263 F.2d 546 (5th Cir. 1959), cert. denied, 360 U.S. 902, 79 S. Ct. 1285, 3 L.Ed.2d 1254 (1959). That was a class action by black members of Local 2708 against the Local and Armco Steel Corporation for discrimination against black employees in violation of the duty of fair representation arising from the consummation of the collective bargaining agreement of May 31, 1956. In that case the district court (Ingraham, J.) concluded that the dual line system and promotional sequence were required by prudent business operations and not motivated by bad faith or racial animus. 156 F.Supp. at 435–436. Similarly the court found that the May 31st agreement including its transfer and testing provisions, was free of racially discriminatory intent. 156 F.Supp. at 437–438. The Court of Appeals (Wisdom, J.) affirmed, saying of the May 31st agreement, "Angels could do no more." 263 F.2d at 551. Angels can-

not, but the Congress of the United States can. 42 U.S.C. § 2000e, et seq.

On July 7, 1970, the Court of Appeals (Wisdom, J.) reversed a dismissal of part of this lawsuit based upon the *Whitfield* holding. Taylor v. Armco Steel Corp., 429 F.2d 498 (5th Cir. 1970). The Court of Appeals distinguished *Whitfield* as resting upon 29 U. S.C. § 151 et seq., and the "fair representation" doctrine of Steele v. Louisville & N.R.R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). This case was remanded for reconsideration in light of the passage of Title VII of the 1964 Civil Rights Act and the cases construing it. In so doing, Judge Wisdom noted that the May 31st agreement "improved the lot of many black employees but still fell short of cleansing progression lines of past racial discrimination." 429 F.2d at 499. That is our point of departure.

In the first instance *Whitfield* was a suit under the National Labor Relations act for a violation of the duty of fair representation. There the Plaintiffs contended that the Union had violated this duty by acceding to a contract which did not remove all of the stigma of their former condition. The federal courts held that the federal labor laws, both legislative and judicial, had not been violated, and that the union's assent to a system which corrected some of the inequities of the past had not been "unfair."

Title VII, 42 U.S.C. § 2000e et seq., created a new standard and a new cause of action. The standard is "equality" not "fairness." The cause of action is one for relief from employment practices existing on or after July 2, 1965, which deprived persons of equal employment opportunity on account of their race, color, religion, sex or nationality. 42 U.S.C. § 2000e–2. As interpreted by the courts, this cause of action includes what may be described as a "relation back" theory of relief or "justice in retrospect." Plaintiffs in a Title VII suit may seek to eliminate the *present ef-*

*fects* of past racially discriminatory conduct, that is, conduct which would now violate Title VII. Long v. Georgia Kraft Co., 450 F.2d 557 at 558 and 561–562 (5th Cir. 1971); Bing v. Roadway Express, Inc., 444 F.2d 687, 690 (5th Cir. 1971); Robinson v. Lorillard Corp., 444 F.2d 791, 795 (4th Cir. 1971); United States v. Dillon Supply Co., 429 F.2d 800 at 803–804 (4th Cir. 1970); Local 189 v. United States, 416 F.2d 980, at 987–989 (5th Cir. 1969).

The applicable law is different now than it was at the time of *Whitfield*, and the relevant facts are different. A 1957 finding that the separate lines and the line seniority system are not breaches of the duty of fair representation owed to blacks is not the same as a determination that these institutions do not deprive blacks of equal employment opportunities.[2] Here, the Defendants' liability is dependent upon the facts in existence on and after July 2, 1964, and whether, in light of Title VII, those facts caused or perpetuated racial discrimination in employment opportunity. These facts of course were not before Judge Ingraham in *Whitfield*, and the agreement and systems whose residual effects the Plaintiffs attack here are to be judged by a law which did not exist when *Whitfield* was decided. Consequently, the Defendants' assertion that *Whitfield* is *res judicata* must be rejected.

## THE SENIORITY AND TRANSFER SYSTEM, 1942–PRESENT

Prior to May 31, 1956, in departments with dual lines of progression black employees were employed only in Line 2 (unskilled) jobs and in the labor pool. White employees were employed only in Line 1 (skilled) jobs. When what evolved into Armco's Houston Works opened in April, 1942, hiring was segregated. The United States Employment Service (USES) furnished common laborers to the plant from an all-black branch and furnished semi-skilled and skilled laborers from an all-white branch. The plant also hired persons who were not referred by USES, and these were hired on a segregated basis. Regardless of intelligence, skill, or ability, whites were placed in the trade and craft lines and blacks in the common labor lines. As the company organized the plant it developed definite job sequences in each department, and in those departments with both trade and craft jobs (white) and common labor jobs (black) these jobs were grouped together and the lines of progression were designated Line 1 and Line 2. In the 1950's the Local began to press for an end to the racial hiring and progression practices. This culminated in the May 31, 1956 Agreement [the Agreement]. See Appendix A.

The Agreement made two significant changes in the employment practices at Sheffield (now Armco). Segregated hiring came to an end. Blacks could now move from Line 2 to Line 1 jobs. Line 2 employees could fill openings in Line 1 on the basis of their Line 2 seniority regardless of their position in Line 2, but only after taking and passing a test administered by the company. Line 2 seniority could not be used for advancement or retention in Line 1. Advancement and retention within Line 1 was based upon Line 1 seniority only, which began to accrue when the employee received a permanent assignment in the line.

2. In Local 189 v. United States, the Fifth Circuit accepted a district court's distinction of *Whitfield* upon the following basis: " '*Whitfield* does not stand for the proposition that present discrimination can be justified simply because it was caused by conditions in the past. Present discrimination was allowed in Whitfield only because it was rooted in the Negro employees' lack of ability and training to take skilled jobs on the same basis as white employees'." 416 F.2d 980 at 992 citing Quarles v. Philip Morris, Inc., 279 F.Supp. 505 at 518 (E.D.Va., 1968). The "present discrimination" allowed in Whitfield, is the "residual" or "hang-over" discrimination attacked here. It was not actionable under the duty of fair representation. It is actionable under Title VII of the 1964 Civil Rights Act. 42 U.S.C. § 2000e, et seq.

In the event of a layoff, personnel who were bumped from a line spent one week in the labor pool (Yard and Track Labor Department) and were then permitted to bid back into the lines on the basis of their line seniority. Thus a former Line 2 employee bumped from Line 1 could re-enter Line 2 and advance up that line as far as his accrued Line 2 seniority would permit. The one week lay-over was necessitated because of the administrative problems inherent in scheduling employees for the next week's work. Workers "holding" in the labor pool could work temporary vacancies in the lines caused by illness, injury or vacation, despite their laid-off status.

After the Agreement, openings in Line 1 starting jobs (except apprenticeship positions) went first to test-qualified Line 2 employees (i.e., blacks) on the basis of their Line 2 seniority, then to test-qualified employees of the Yard and Track Labor Department (composed of whites and blacks from the merged Extra Board and Yard and Track Labor Department), then to test-qualified new employees. Agreement § 5 paras. A, B, and C. Openings on Line 2 starting jobs were to be filled by Yard and Track employees. Agreement § 4. All new employees would be hired into the reconstituted Yard and Track Labor Department. Agreement § 1. The theory behind the Agreement was to give preference for Line 1 jobs to current Line 2 black employees and to integrate the hiring process so that both lines of progression would become integrated as Line 2 blacks transferred to Line 1 and new employees, both black and white, moved up Line 2.

As noted, Line 2 employees who transferred could not use their previous Line 2 service in Line 1. The Agreement did not provide for "rate retention." That is, transferees were not paid at the rate of their former job in Line 2, but at the rate set for the Line 1 job. In some instances this meant an increase in pay when the transferee moved from a lower job classification to a higher one. It could also mean a pay decrease for an employee moving from a higher job classification to a lower one and for an employee moving from a lower job classification with incentive pay to a higher job classification without incentive pay. It should be reemphasized that a Line 2 employee did not have to go to the top job in Line 2. He could attempt to transfer to Line 1 from any position in Line 2. However, the new system deprived transferees of their earned seniority, exposed them to a possible pay cut, and permitted less-senior new employees to by-pass Line 2 employees and enter Line 1 ahead of them. The Defendants do not deny that the system operated in this fashion, only that it was discriminatory.

There was, as might be expected, considerable unhappiness with the test requirement as a precondition to entering Line 1. Many black employees refused to take the test as they considered it degrading.[3] Others took it and passed, some failed. The newly hired employees, black and white, did not like the test requirement either. The Local made several attempts to have the test eliminated, but was not successful until 1964, when Armco dropped the test as the price for resolving a "slow-down" which was hurting production. By a supplementary agreement dated March 1, 1964, (Appendix B, Pltf. Ex. 23), the Agreement was amended to drop the test requirement. In its stead an "effective notice" system was created whereby a Line 2 employee would signal his willingness to transfer to Line 1 and to be considered for temporary and extended vacancies in that line by filing an "effective notice" with his supervisor. A Line 2 employee would not be considered for a temporary or extended move-up or a permanent opening in Line 1 unless he filed such a notice. In practice an employee who filed such a notice was re-

3. Similar vestiges of our past have been called "the badges and incidents of slavery." Jones v. Alfred H. Mayer Co., 392 U.S. 409, 441, 88 S.Ct. 2186, 2204, 20 L.Ed.2d 1189 (1968).

quired to fill any temporary or extended vacancies in Line 1. If he did not move-up his notice was considered to be revoked. However, an employee who filed such a notice could decline to take permanent openings in Line 1. A Line 2 employee who did move-up to fill a temporary or extended vacancy in Line 1 did not earn Line 1 seniority for the time he spent on the job, even though the temporary assignment might last many months.

The March 1, 1964, supplemental agreement did not provide for rate retention for inter-line transfers or permit transferees to carry Line 2 seniority into Line 1. It did eliminate the required test and replace it with an effective notice system. With a few other minor changes (see, Pltfs. Ex. 25, 26 and 27) the seniority and transfer system established by the May 31, 1956, Agreement as amended March 1, 1964, was in effect on July 2, 1965, and continues in use today.

It is now necessary to determine how that system has affected the racial composition of the departments in suit and how it may have deprived blacks of equal employment opportunities.

THE NUMBERS GAME
RACIAL COMPOSITION OF THE DEPARTMENTS

The figures used for the computations in this section were derived from Pltfs. Ex. 16 and Deft. Armco Exs. 7a–n, 51 and 52. In determining whether an employee was hired before or after the May 31, 1956 Agreement, the date of July 31, 1956 has been selected since, under §§ 1 and 5 para. D of the Agreement, it did not become effective until sixty days after its acceptance. Thus a "Pre-Agreement" employee is an employee whose departmental and plant continuous service dates are earlier than July 31, 1956. A "Post-Agreement" employee is an employee whose departmental and plant continuous service dates commence on or after July 31, 1956.

Some personnel have plant seniority dates earlier than July 31, 1956, and departmental seniority dates after July 31, 1956. Presumably these workers transferred from another department. Since the use of departmental seniority is the crux of the lawsuit, such men are classified statistically as "Post-Agreement" employees.

One caveat is in order; while figures do not lie, statistics rarely speak for themselves. Human perception of mathematical precision is often imperfect. The meaning of objective statistical data is a gloss provided by men—subjects with their own points of view—and hence subjective. However, we are not dealing with objects, but with subjects—other men. Perhaps a little human subjectivity is not erroneous under the circumstances. In trying to evaluate the data the figures have been broken down into categories to depict the racial composition of the department and of each line in the department. These "line" totals have been reduced further to reflect the number of "pre-agreement" and "post-agreement" whites and blacks in each line, in an attempt to determine whether the hiring system is integrated. The Line 2 to Line 1 transfer system is examined in a separate category according to two time periods: the first, from the effective date of the Agreement to the elimination of the test on March 1, 1964, and the second from the elimination of the test to the "present." The "present" is actually two years ago, but the parties seem confident that the statistics have not changed significantly in the intervening years. Judging from the slow turnover evident in a cursory glance down the seniority lists their confidence is justified. Any change will not significantly alter the overall employment pattern.

Keeping in mind the Plaintiffs' allegations of bypassing by junior whites, an attempt will also be made at evaluating whether black employees have begun to enter the higher paying Line 1 jobs in each department.

## 1. THE STRUCTURAL MILL

Function: rolls structural shapes; such as angles, grader blades, drill collars, channels, beams and billets.[4]

Total Employees: 133 (68 W; 65 B)
Line 1 54 (43 W; 11 B)
Line 2 79 (25 W; 54 B)

| | Pre-Agree W | Pre-Agree B | Post-Agree W | Post-Agree B |
|--------|-------------|-------------|--------------|--------------|
| Line 1 | 34 | 11 | 9 | –0– |
| Line 2 | –0– | 33 | 25 | 21 |

Transfer Data: Line 2 to Line 1 Transferees

| | Pre-Agree B | Post-Agree W | Post-Agree B |
|--------------|-------------|--------------|--------------|
| 1956–64 | 2 | 4 | –0– |
| 1964–Present | 9 | 5 | –0– |

While black employees have advanced into some of the better paying jobs in Line 1, the line remains predominantly white with blacks holding the lower jobs in the line. The highest black, Reden, holds a JC 10, followed by two JC 8's and two JC 7's. There are sixteen persons holding job class ratings above JC 10, all are white. Of the five JC 10's only one is black. The lowest jobs in Line 1 are presently held by whites. While Line 2 is still predominantly black, the number of new entrants seems racially balanced since the Agreement: 21 blacks to 25 whites.

Only one-fourth of the Pre-Agreement Line 2 blacks managed to transfer to Line 1. The number of black transferees into Line 1 increased dramatically with the elimination of the test. This is generally true in every department examined. The number of white entrants did not change appreciably. Consequently, whites junior in department seniority have bypassed blacks in Line 2 and preceded them into Line 1. After the effective date of the Agreement (July 31, 1956) of the first ten workers to enter Line 1 four were white and six were black (WBBWWWBBBB). The first entrant, L. McClelland (W), entered Line 1 the same day he entered the plant by passing all blacks in Line 2. Between July 31, 1956, and March 1, 1964, six men entered Line 2 of the department, four whites (McClelland, Eskew, Selph and Alwell) and two blacks (Alexander and Hickman). All four whites transferred into Line 1 in less than one year. The two blacks have remained in Line 2. These four whites outrank every other black now in Line 1 in line seniority, but not in department or plant seniority, except Reden and Jackson.

As noted the first man to enter the department after the Agreement was a white on August 7, 1956, who entered Line 1 directly. Thereafter Reden and Jackson transferred from Line 2 to Line 1 and then five more men entered the department. Three whites entered the department and Line 1 on May 16th, 23rd and 27th, 1957 and two blacks entered Line 2 of the department on June 11, 1957. No other men entered the department until October 26, 1964, when over a two year period to November 21, 1966, eighteen men entered Line 2 of the department, including fourteen whites and four blacks. The first eight of these were whites beginning with E. John, Jr., on October 26, 1964. From that date on entrance into the depart-

---

4. The short description of the function of each department is taken from Plaintiffs' Exhibit 28, which was admitted without objection.

ment was on a racially non-discriminatory basis.

The rebidding of the jobs in the Structural Mill, noted briefly above, occurred pursuant to an agreement worked out on August 9, 1966. Because of changes in the lines of progression, it was decided that the jobs in the mill should be rebid. It appears that some of the jobs were initially refilled on the basis of department seniority. However, on August 9, 1966, Armco and the Local agreed *inter alia* that in rebidding the jobs in Line 1, Structural Mill employees would have had an advance on the basis of Line 1 seniority. See, Pltfs.' Ex. 24. The black employees were generally unsatisfied with this arrangement, and their dissatisfaction sparked this lawsuit. Some black employees lost jobs as a result of the rebidding and the restriction to Line 1 seniority prevented others from outbidding whites (and other blacks) with less department service.

## 2. THE ELECTRIC FURNACE [5]

Function: Location of five electric steelmaking furnaces. Produces steel ingots from raw materials.

Total employees: 382 (176 W; 206 B)
Line 1 230 (163 W; 67 B)
Line 2 152 ( 13 W; 139 B)

| | Pre-Agree W | Pre-Agree B | Post-Agree W | Post-Agree B |
|------------|-------------|-------------|--------------|--------------|
| Helper L1 | 77 | 11 | 16 | 31 |
| Crane L1 | 67 | 22 | 3 | 3 |
| Pit L2 | −0− | 39 | 13 | 100 |

Transfer Data: Line 2 to Line 1 Transferees

| Crane Line | Pre-Agree B | Post-Agree W | Post-Agree B |
|--------------|-------------|--------------|--------------|
| 1956–64 | 4 | 3 | 1 |
| 1964–Present | 18 | [1]* | 2 |

| Helper Line | Pre-Agree B | Post-Agree W † | Post-Agree B † |
|--------------|-------------|----------------|----------------|
| 1956–64 | 1 | 2 | 2 |
| 1964–Present | 11 | 14 | 28 |

* One man, A. Major, has a 1942 department date, but did not enter the crane line until 1966. He is JC 9.

† Only five of these men (two whites and three blacks) hold permanent positions in Line 1 at the present time.

———◆———

There are many high ranking jobs in both the Helper and Crane Lines 1; e.g. forty-five positions from JC 11 to JC 24 in Helper Line 1, and twenty-nine positions from JC 12 to JC 16 in Crane Line 1. The highest positions held by blacks with Line 1 seniority are JC 6's.

Line 2 is almost totally black, with very few whites and large numbers of blacks entering that line since the Agreement.

About 45% of the Pre-Agreement Line 2 blacks were able to transfer to Line 1. However, the movement was not significant until the test was aban-

5. The Electric Furnace replaced the Open Hearth which could not meet state pollution requirements. It has two Lines 1, the Crane Line and the Helper Line. Seniority is accumulated in each line separately. When the Open Hearths closed in May of 1970 those workers were absorbed by the Electric Furnace.

doned. The number of whites transferring from Line 2 to Helper Line 1 also shot-up when the test was dropped.

The "blackness" of the Pit Line, as well as the failure of black transferees to reach any of the higher job classes in the Crane and Helper lines, may be explained by the reduction in operations in this area and the shut down of the Open Hearth which has created a personnel surplus. Advancement up the lines has been choked-off because the incumbents are hanging on to what jobs remain. This is an example of how the failure to credit employees with department seniority, as opposed to line seniority, has frustrated attempts to integrate Line 1 and perpetuated the evil of past racial discrimination long past the effective date of Title VII. Former Line 2 blacks, e.g. Allen Jackson, who had managed to transfer to Line 1 found themselves "bumped" during layoffs by whites with less service in the department and who had been placed initially in Line 1.

After the Agreement the first four men to enter the Helper Line were white, and all entered that line directly in 1956 without serving in Line 2. The first black to enter the Helper Line was Yancy who entered directly on August 20, 1961. He was followed by a transferee and a direct entrant in 1963 and also in 1964. All four were black. Thereafter fifty-one men have entered the Helper Line, fourteen whites and thirty-seven blacks. Of these one white and eleven blacks entered the line directly. The first man to enter the Crane Line after the Agreement was a black transferee on May 6, 1957. He was followed in the same month by three direct entrants, all white. In 1959, three blacks transferred into the line and one entered directly. All other entrants have been black transferees except for a white, A. Major, in 1966. After the agreement, the first four men to enter the Pit Line were black, two in 1957 and two in 1961. No other men entered until 1965 after the Agreement was modified. During that year the first white entered the Pit Line. The Court concludes that segregated line assignments stopped with Yancy on August 20, 1961. Thereafter entrance into the department, although largely black, was on a non-discriminatory basis.

## 3. BLOOMING MILL

Function: A primary mill that rolls ingots from the Electric Furnace into blooms and billets.

The Blooming Mill has two levels of operation: Ten Turns and Fifteen Turns. At the Ten Turn level, the mill has two "turns" (shifts) five days-a-week. At the Fifteen Turn (continuous operations) level, the mill has three "turns" five days-a-week. A separate seniority schedule is maintained for each level of operation, so that a man can hold a "permanent" assignment on each level and simply steps into the assigned position when operations increase. This has the advantage of providing continuity and avoiding chaos since the men know in advance where they will go. The Plaintiffs contend that this system coupled with line seniority prevents blacks from bidding on the better jobs during an increase in operations and retaining the better jobs when operations are reduced. Instead the better jobs go to whites with less departmental service.

Presently the mill is operating at the Ten Turn level.

| Ten Turns | | Fifteen Turns | |
|---|---|---|---|
| Total Employees: | 115 (78 W; 37 B) | Total employees: | 155 (96 W; 59 B) |
| Line 1: | 95 (72 W; 23 B) | Line 1: | 95 (72 W; 23 B) |
| Line 2: | 20 ( 6 W; 14 B) | Line 2: | 60 (24 W; 36 B) |

| Ten Turns | Pre-Agree W | Pre-Agree B | Post-Agree W | Post-Agree B |
|---|---|---|---|---|
| Line 1 | 43 | 17 | 29 | 6 |
| Line 2 | –0– | 11 | 6 | 3 |

| Fifteen Turns | Pre-Agree W | Pre-Agree B | Post-Agree W | Post-Agree B |
|---|---|---|---|---|
| Line 1 | 43 | 17 | 29 | 6 |
| Line 2 | –0– | 11 | 24 | 25 |

Transfer Data: Line 2 to Line 1 Transferees.
(Same both turns)

| | Pre-Agree B | Post-Agree W | Post-Agree B |
|---|---|---|---|
| 1956–64 | –0– | 2 | 2 |
| 1964–Present | 17 | 27 | 4 |

Whites hold the best jobs and constitute a 3:1 majority in Line 1. However, three-fifths of the Pre-agreement Line 2 blacks have gotten into Line 1; although, none made it until the test was dropped. Only two Post-Agreement whites (Hundley and Holbert) and two Post-Agreement blacks (Brown and Hoskins) moved into Line 1 ahead of the bulk of the Pre-Agreement black transferees.

On the Ten Turn level, the blacks have one JC 13 and several JC 9's. On the Fifteen Turn level, the blacks pick up two JC 13's, one JC 12, and one JC 11. However, the highest jobs at both levels are filled by whites. This situation cannot be expected to improve under the present system, since as the older white employees die or retire (e.g., from F. M. Davis to J. Konell), they will be replaced by whites hired in the 1950's. (e.g., M. Holcomb to C. Hundley). The present Line 1 blacks (e.g., Leo Brown to H. Hawkins) can be expected to suffer the same rate of attrition as their white contemporaries at the top of the line. These blacks will be replaced in turn by a new generation of employees who came into Line 1 in 1969 and are primarily white (e. g., from L. Claybon to C. Mills only 5 of 32 are black, and one of those entered the plant in 1946).

It is abundantly clear that blacks have not been channelled into Line 2 since the consummation of the 1956 Agreement. The first four men to enter the department after the Agreement were Hundley (W) in 1957, Brown (B) in 1959, Holbert (W) in 1961 and Hoskins (B) in 1962. All went directly to Line 1. No men entered Line 2 of the department after the Agreement until April 18, 1966, when nine whites and one black did so. They have all since entered Line 1. Entrance into the department has been nondiscriminatory since the effective date of the 1956 Agreement.

Plaintiffs' contention that the combination of line seniority and permanent assignments at the Ten and Fifteen Turn levels freezes blacks out of the better paying jobs in Line 1 seems to be borne out by the seniority lists. Of forty-one jobs rated at JC 11 to JC 19 on the Ten Turn level the blacks hold one, a JC 13. Of thirty-two jobs rated at JC 11 to JC 19 on the Fifteen Turn level the blacks hold five, three JC 13's, one JC 12 and one JC 11. When operations are reduced these five blacks revert to one JC 13, one JC 8, one JC 7 and two JC 6's. The use of permanent assignments on both levels seems to be a reasonable business practice, but the infrequency of the Fifteen Turn level combined with the use of line seniority does

prevent blacks hired in the plant's segregated days from even attempting to hold better paying jobs. A system which locks in the discriminatory effect of prior discrimination violates Title VII. Peters v. Missouri-Pacific R.R. Co., 483 F.2d 490 (5th Cir. April 10, 1973, modified June 27, 1973).

### 4. PLATE MILL

Function: Rolls slabs from Combination Mill into plates.

The Plate Mill also operates on Ten Turn and Fifteen Turn levels, but separate seniority lists are not maintained for each level.

Total employees: 231 (130 W; 101 B)
Line 1 118 ( 89 W; 29 B)
Line 2 113 ( 41 W; 72 B)

| | Pre-Agree W | Pre-Agree B | Post-Agree W | Post-Agree B |
|--------|-------------|-------------|--------------|--------------|
| Line 1 | 61 | 10 | 28 | 19 |
| Line 2 | –0– | 25 | 41 | 47 |

Transfer Data: Line 2 to Line 1 Transferees

| | Pre-Agree B | Post-Agree W | Post-Agree B |
|--------------|-------------|--------------|--------------|
| 1956–64 | 2 | 9 * | 5 * |
| 1964–Present | 8 | 19 | 14 |

* Did not serve in Line 2 before entering Line 1.

———◆———

Line 1 still retains characteristics of a "white" line. The whites outnumber the blacks by about 3:1. This in itself is not unusual considering the ratio of whites to blacks in the Houston area. However, all of the top jobs in the line are held by Pre-Agreement whites. There are thirty-seven jobs in Line 1 rated at JC 10 or higher, three are JC 29's. None are held by blacks. The highest black in Line 1 is a JC 8. None of the whites who have entered the line since the Agreement have achieved jobs higher than JC 9.

Obviously once the test was no longer required transfers into Line 1 increased sharply both in absolute numbers and in percentages. None of the Post-Agreement whites or Post-Agreement blacks who entered Line 1 between July 31, 1956 and March 1, 1964, served any time whatsoever in Line 2. This highlights the shut-off of Line 1 to Pre-Agreement blacks in Line 2 during this period.

While the hiring into Line 2 is now integrated it is a recent phenomenon. The first white to enter Line 2 was E. The first white to enter Line 2 was E. Vyoral (Badge #954) on February 16, 1964, seven and one-half years after the Agreement. He was preceded by twelve blacks and followed by two more. The next two whites were P. Becka (#4215) and J. Cummings (#4222) on August 8, and 10, 1965, who transferred to Line 1 at the same time as Vyoral. The most senior white presently in Line 2 is D. Ward (#4453) who entered the Line and the department on May 8, 1966. Hiring into the department did not become integrated in any real sense of the word until the hiring of Becka and Cummings. Prior to that time Line 2 hiring was black with the exception of Vyoral and the whites and blacks who entered Line 1 immediately upon entering the department.

## 5. MERCHANT MILL

Function: Rolls billets into small rounds, rebar and bar size shapes.

Total employees: 48 (28 W; 20 B)
 Line 1: 30 (25 W; 5 B)
 Line 2: 18 ( 3 W; 15 B)

| | Pre-Agree W | Pre-Agree B | Post-Agree W | Post-Agree B |
|---|---|---|---|---|
| Line 1 | 19 | 3 | 6 | 2 |
| Line 2 | –0– | 11 | 3 | 4 |

Transfer Data: Line 2 to Line 1 Transferees

| | Pre-Agree B | Post-Agree W | Post-Agree B |
|---|---|---|---|
| 1956–64 | –0– | 1 | –0– |
| 1964–Present | 3 | 5 | 2 |

Between July 31, 1956, and June 6, 1966, only two men entered the department. On May 29, 1957, Lawrence Van Dine, a white man, entered the department and Line 1 simultaneously. This would imply that there were no test-qualified Line 2 blacks available to fill the opening. Van Dine now holds a JC 10. The next man to enter the department was Rufus Vital, a black man originally hired in 1948. He entered Line 2 on August 10, 1958. No other openings occurred until well after the test was eliminated. Then on June 6, 1966, three blacks (Frazier, White and Davis) entered Line 1 from Line 2. They were replaced in Line 2 by two whites (Young and Supercinski) and one black (Duncan). Young and Duncan transferred to Line 1 about one year later. Since there was so little hiring activity between 1956 and 1966 it cannot be said that a segregated hiring pattern continued. There is simply no pattern. However, the one white man who entered the department during that time entered the former "white" line, and the one black man who entered the department entered the former "black" line. The segregated pattern was not broken and the assignments of Van Dine and Vital are consistent with it. This is especially true inasmuch as they originally entered the plant in 1948 (Vital) and 1955 (Van Dine) under the segregated system then in effect. Consequently entrance into the Merchant Mill did not become non-discriminatory until June 6, 1966.

There are twenty positions in Line 1 rated at JC 10 and above, including one JC 20, two JC 19's and four JC 15's. Two of these positions are held by blacks (Frazier and White). They are both JC 12's. The other three blacks hold down one JC 9 and two JC 6's. The JC 6 is the lowest job class in Line 1: it is also the highest job class in Line 2. The pay-cut problem which transferees encounter in other departments is not found here.

## 6. ROD MILL

Function: Rolled reinforcing bars and coiled rods.

Total employees: 62 (34 W; 28 B)
 Line 1: 28 (24 W; 4 B)
 Line 2: 34 (10 W; 24 B)

Line 1 contained twenty-three Pre-Agreement whites, one Post-Agreement white, and four Pre-Agreement blacks from Line 2. The one Post-Agreement white entered Line 1 on November 21, 1956, one day after entering the plant and without serving in Line 2. One Line 2 black entered Line 1 in 1958 before the test requirement was dropped, and the other three transferred in the early 1970's shortly before the mill closed. Presumably the one white entrant (Marion Wilson) was able to go into the line as early as he did because there were no test-qualified Line 2 personnel available. Otherwise, he would have entered Line 2, and most likely still be there between James Simmons and Gene McComb. Other than Wilson no workers entered the department after the Agreement until 1966. On October 3, 1966, Gene McComb, a white, entered Line 2 of the department about seven months after entering the plant. Beginning with McComb entrance into the department until the time it closed was quite integrated, with ten whites and seven blacks entering the line.

The highest job rating in Line 2 was a JC 6. The lowest in Line 1 was a JC 4, the highest was a JC 20. Thus a transferee would face a pay-cut, but this was short lived. The next job up in Line 1 was a JC 7. Of the five men who entered Line 1 since the Agreement one (Wilson) held a JC 8, two transferees held JC 7's and two transferees held the bottom jobs, JC 4's.

## 7. WIRE MILL (Closed)

Function: Drew coiled rods from the Rod Mill into wires.

Total employees: 50 (30 W.; 20 B)
Line 1 23 (18 W; 5 B)
Line 2 27 (12 W; 15 B)

| | Pre-Agree W | Pre-Agree B | Post-Agree W | Post-Agree B |
|--------|-------------|-------------|--------------|--------------|
| Line 1 | 7 | 2 | 11 | 3 |
| Line 2 | –0– | 8 | 12 | 7 |

No one entered either line of this department between the effective date of the Agreement and the end of the test in 1964.

Entrance into the Wire Mill was non-discriminatory on and after July 31, 1956. Beginning in 1965 a great flurry of activity saw sixteen men enter Line 1 in less than five years. Of these four blacks and two whites transferred to Line 1, and one black and nine whites entered Line 1 directly. The five blacks were particularly well placed, holding three JC 10's and two JC 5's. Line 1 contained ten JC 10's, the highest job rating, and one JC 2 and one JC 3, the lowest ratings. Line 2 contained seven JC 8's, one JC 7 and one JC 6, as well as sixteen JC 5's. Its lowest jobs were also JC 2 and JC 3, one each. This would be a powerful disincentive to transfer since a transferee would have to enter the bottom jobs in Line 1, and might account for the fact that so many persons entered Line 1 between 1965 and 1970 either directly or after only a short time in Line 2. It is also worthy to note that the job titles and therefore job content were almost identical in each line.

## 8. NAIL MILL (Closed)

Function: Nail machines cut and stamped wire from Wire Mill into nails.

No figures were presented by either side on the racial breakdown of this mill or the relative seniority positions of the employees.

## 9. SHIPPING DEPARTMENT

Function: Includes two areas—the Bar Storage Area, which as its name implies is where bars and other products are stored, and the Combination Mill, a primary mill which rolls ingots into slabs, and slabs into plates.

Total employees: 239 (121 W; 118 B)
Line 1 131 ( 70 W; 61 B)
Line 2 108 ( 51 W; 57 B)

| | Pre-Agree W | Pre-Agree B | Post-Agree W | Post-Agree B |
|--------|-------------|-------------|--------------|--------------|
| Line 1 | 32 | 28 | 38 | 33 |
| Line 2 | –0– | 18 | 51 | 39 |

Transfer Data: Line 2 to Line 1 Transferees

| | Pre-Agree B | Post-Agree W | Post-Agree B |
|--------------|-------------|--------------|--------------|
| 1956–64 | –0– | 7 * | 3 * |
| 1964–Present | 28 | 31 | 30 |

* All seven whites and two of the blacks entered Line 1 directly without serving in Line 2.

———◆———

Once again the elimination of the test permitted a large number of men to compete for and enter Line 1. Where during the test era only one man, a black, actually transferred, since the test ended 89 men have gone from Line 2 to Line 1.

On a numerical basis the lines can be described as integrated at the present time. The department itself is almost evenly divided. The whites are a small majority in Line 1 and the blacks have a slight edge in Line 2. Since the Agreement 89 whites and 72 blacks have entered the department, seven whites and two blacks going directly to Line 1 and the others into Line 2. While this is the gross result, the fine details are not that rosy. As noted, the existence of the test kept blacks with long service in Line 2, while seven less senior whites and three less senior blacks entered Line 1. In 1957 sixteen men entered the department. The six whites entered Line 1 directly. The ten blacks entered Line 2 and after the elimination of the test they eventually transferred to Line 1. In 1963 one white entered the department in Line 1. From July 31, 1956 to September 14, 1964, of nineteen entrants all seven of the whites and only two of

twelve blacks entered Line 1. The remaining blacks were put in Line 2. The first white employees, B. Smith and R. Dockery, entered Line 2 of the department on September 14, 1964, along with three blacks, C. Perkins, M. Charles and G. Pradier. From that date on, entrance into the department loses any racially identifiable character. All the men since that date were assigned initially to Line 2. Some have made it to Line 1, others have not.

For those who "made it" progress to the higher jobs has been swifter than in other departments. The top job in the Combination Mill channel of Line 1 is the Car Bottom Furnace Operator, JC 11. All three of these positions are occupied by whites hired in the early days of the plant. The next job down the line of progression is Burning Machine Operator, JC 10, and it is held by five blacks and four whites. All five of the blacks entered Line 1 after the test was eliminated, three of them entered the department before the 1956 Agreement, one entered the department in 1957 and one in 1966. This last man, G. Harris, entered the plant on March 7, 1966, Line 2 of the department on March 28, 1966, and Line 1 on May 21, 1967. He has al-

ready moved up the line to a JC 10. On the same day that Harris entered the line eight men (two blacks and six whites) transferred from Line 2 to Line 1. Four men entered each channel. In the Combination Mill channel, Harris (B), Ward (W), and Morrison (W) are now Burning Machine Operators, JC 10. Denyer (W) is a Plate grinder, JC 5, the bottom job in the channel. In the Bar Storage channel, Lee (B), Youngblood (W), and Ramey (W) are Crane Operators, JC 8, the highest rating in the channel. Morris (W) is a Scaler, JC 5, which is the bottom job. The treatment and advancement of these men is fairly representative of the treatment and advancement in the post Title VII era. As for example, since the end of the test twenty of the fifty-two "top jobs" in the Bar Storage channel have been filled by blacks.

The highest jobs in Line 2 are rated as JC 7's and JC 8's. There would be little incentive for senior workers who held these jobs to transfer to the JC 5 bottom jobs in Line 1 with the attendant loss in usable seniority and cut in pay. For the most part the blacks who did move to Line 1 when the chance developed were those who entered the plant in the mid-1950's. No doubt the fact that Line 1 offered many more JC 8's than Line 2 and the possibility of advancing to JC 9, 10, or 11 in the Crane channel influenced these men. They have advanced despite, not because of, the handicaps placed on transfer. Whether the older black workers would have succeeded as well if the opportunity had been afforded them originally or earlier is a question no one can answer. It is clear that they were not given the opportunity; and that later, and even now, they would be subjected to institutionalized disadvantages if they sought to avail themselves of the opportunities originally denied them. This is the type of present effect of past racially discriminatory conduct which is condemned by Title VII. Long v. Georgia Kraft Co., supra; United States v. Dillon Supply Co., supra; Local 189 v. United States, supra; Johnson v. Goodyear Tire and Rubber Co., 349 F.Supp. 3 (S.D. Tex.1972). But we are getting ahead of ourselves, and return to an examination of the remaining departments.

## 10. BLAST FURNACE

Function: Produces iron from ore.

Total employees: 61 (20 W; 41 B)
Line 1: 24 (11 W; 13 B)
Line 2: 37 ( 9 W; 28 B)

| | Pre-Agree W | Pre-Agree B | Post-Agree W | Post-Agree B |
|---|---|---|---|---|
| Line 1 | 8 | 3 | 3 | 10 |
| Line 2 | –0– | 14 | 9 | 14 |

Transfer Data: Line 2 to Line 1 Transferees

| | Pre-Agree B | Post-Agree W | Post-Agree B |
|---|---|---|---|
| 1956–64 | 1 | 2 * | 7 * |
| 1964–Present | 2 | 1 | 3 |

* None of the whites and only one black served in Line 2 before entering Line 1.

The Blast Furnace presents an unusual situation. Substantial integration has been achieved in Line 1, both numerically and in terms of the job ratings held. The bottom job in the line is Utility Man, JC 8. All four men holding this position are blacks. The next job up the line is Transfer Car Operator, JC 8. The four men on this job are blacks. Two of the four Larry Car Operators,

JC 10, are blacks; and two of the four Pig Machine Operators, JC 10, are blacks. The highest rating held by blacks is a JC 12. There, two of the four Ore Bridge Operators are blacks. The highest job is that of Stove Tender, JC 14. All four Stove Tenders are white. Only three Pre-Agreement blacks have entered Line 1. Gunnels entered the plant and department on July 8, 1947. He passed the test and entered Line 1 on December 30, 1956, and is now an Ore Bridge Operator, JC 12. The next two, Carrel and McKnight, entered the plant and department in 1947, but did not enter Line 1 until February 1, 1970. One holds the bottom job, the other the next job up. Both are JC 8's. The other three blacks on the bottom job entered the plant in the days of segregated hiring, Line 2 of the department 1957 after the Agreement, and Line 1 in the 1970's after the test was dropped. These men either refused or failed the test. It is difficult to imagine a refusal since a move from Line 2 to Line 1 would, in every case except the top Line 2 job, be a move to a better or equal paying job with a chance to move higher. The only Line 2 men who would not find a transfer economically advantageous would be the Keepers, JC 14, who were being paid as much as the Line 1 top jobs. The next job in Line 2 is that of Cinder Snapper, JC 8, which has the same rating as the Line 1 entry job. Because of the test requirement Carrel, McKnight, Battiste, Reed, and Eagleton could not move out of Line 2 until after March 1, 1964. It seems that they also passed up an opportunity to do so on January 2, 1968, when Hartsfield, a white whose department service dated only from October 9, 1966, transferred ahead of them. The "why" does not appear of record.

Since the Agreement twenty-seven men have entered Line 2. Ten were white and seventeen were black. One of these whites, and three of the blacks have since transferred to Line 1. The first five men to enter Line 2 of the department after the Agreement were blacks. They entered in 1957. No one else entered Line 2 until October 9, 1966, when Hartsfield (W) did so. The pattern of entrances in both lines taken together, however, is inconsistent with the segregated employment history from 1942 to 1956. Between July 31, 1956, and October 9, 1966, fourteen men entered the department. Seven blacks and two whites entered Line 1 directly. Five blacks entered Line 2 directly. This was a break with the past practice of assigning whites exclusively to Line 1 and at the same time assigning blacks exclusively to Line 2. It is not at all like the Shipping Department, where after the Agreement and up to September 14, 1964, seven whites and two blacks entered Line 1 and ten blacks and no whites entered Line 2. Purely racial line assignments in the Blast Furnace ended on the effective date of the 1956 Agreement.

## 11. COKE PLANT

Function: Transforms coal into coke for use in Blast Furnace.

Total employees: 86 (35 W; 51 B)
 Line 1: 25 (18 W; 7 B)
 Line 2: 61 (17 W; 44 B)

| | Pre-Agree W | Pre-Agree B | Post-Agree W | Post-Agree B |
|---------|-------------|-------------|--------------|--------------|
| Line 1 | 18 | 6 | 0 | 1 |
| Line 2 | –0– | 21 | 17 | 23 |

Transfer Data: Line 2 to Line 1 Transferees

| | Pre-Agree B | Post-Agree W | Post-Agree B |
|--------------|-------------|--------------|--------------|
| 1956–64 | 1 | –0– | –0– |
| 1964–Present | 5 | –0– | 1 |

The small number of transfers in this department makes it difficult to evaluate the effect of the test here. There seems to have been only one Line 1 opening during the time the test was in effect and it was filled by a test-qualified black from Line 2, A. Brown, now a JC 9. As a result, Line 1 is still top-heavy with whites hired in the early days of the segregated lines. There are four JC 18's, four JC 16's, four JC 15's, and four JC 12's in Line 1. All are held by white employees, the "youngest" of whom is H. Deshotel, Pusherman JC 12, who entered the plant, the department, and the line on January 18, 1955. Five of the Pre-Agreement blacks in Line 1 have greater department seniority than twelve of the eighteen Pre-Agreement whites, who hold the "top jobs" in Line 1. One of the blacks, A. Brown, has more department seniority than any white except one, and more than every white on every position from JC 12 to JC 18. Yet in bidding for openings these men may not use their aggregate departmental seniority when bidding on jobs or trying to avoid a layoff. They lose credit for from 10 to 22 years of service on jobs which they could not choose not to take when they seek jobs previously denied them because of their race. In this way every time a new opening or a layoff occurs they are revisited with the effects of the former discriminatory system.

No whites have entered Line 1 since the effective date of the 1956 Agreement. The first white man to enter Line 2 was J. Westberry, who did so May 29, 1966. Between July 31, 1956, and May 29, 1966, five men entered Line 2 of the department. All were blacks and had been hired originally in the segregated days of the plant. One of these subsequently transferred to Line 1 in 1970. While the entry of these five blacks is consistent with the former segregated hiring practices, there is a gap of eight years, two months and twenty-five days between the entrance of R. Green and F. Frank. There is no evidence that initial hiring into the plant was segregated when Frank entered the department. It also appears that he was the first in a series of men hired during a period of renewed activity in the department. In an eight month period in 1966, seven men, four blacks and three whites, entered Line 2. After so long a drought in new entrants this must be regarded as one event, and there is no reason to believe that the entrance of Frank (B) and Nash (B) ahead of Westberry (W) was discriminatory. Consequently the last man whose entrance into Line 2 was a continuation of the past segregated practices was R. Green who entered Line 2 on December 2, 1957. Thereafter entrance into the department was non-discriminatory.

## 12. SINTERING AND ORE BEDDING PLANT

Function: "Sintering" transforms ore dust (fines) into cokes usable for the blast furnace. "Ore bedding" combines various types ores into an homogenous mixture.

| | |
|---|---|
| Total employees | 23 (9 W; 14 B) |
| Line 1 | 12 (4 W; 8 B) |
| Line 2 | 11 (5 W; 6 B) |

This department was originally staffed in 1957. Prior to that time it was part of the Blast Furnace. There are no Pre-Agreement employees as such in terms of departmental service. Ten men have transferred from Line 2 to Line 1 since the test was dropped—two whites and eight blacks. Two whites entered the department and Line 1 on August 20, 1957, and presently hold the

top jobs of Burnermen, JC 12. They were the second and third men to enter the department. The first and the fourth are blacks, who entered on January 9, 1957, and December 2, 1957. These four were the department until a white entered on November 27, 1966. He transferred to Line 1 two months later. The next three men entered the department almost simultaneously and were all blacks—Waterhouse, December 5, 1967, Yarbrough and Johnson, both January 2, 1968. Yarbrough and Johnson have since moved to Line 1. Beginning in 1966 seven whites and twelve blacks entered the department. Against this history the inescapable conclusion is that the original staffing in 1957 was segregated, but that entry into the department after December 5, 1957, was non-discriminatory.

## 13. ROLL SHOP

Function: Conditions rolls for use in all rolling mills.

Total employees: 35 (21 W; 14 B)
 Line 1 32 (21 W; 11 B)
 Line 2 3 ( 0 W; 3 B)

| | Pre-Agree W | Pre-Agree B | Post-Agree W | Post-Agree B |
|--------|-------------|-------------|--------------|--------------|
| Line 1 | 19 | –0– | 2 | 11 |
| Line 2 | –0– | 2 | –0– | 1 |

There have been no interline transfers in this department. Since the Agreement all assignments (two whites and eleven blacks) have been to Line 1, except for two blacks assigned to Line 2, one in 1957, the other in 1969. Both entered the plant originally under the segregated hiring system. Line 2 remains exclusively blacks.

The first man to enter the department after the Agreement was J. M. Hooper, a white, on November 11, 1957. He was assigned to Line 2. The next man after Barber was S. W. Davis, a black, who entered Line 1 directly on November 19, 1962. Then and thereafter entrance into the department has been almost entirely black but can be regarded as non-discriminatory with every black but one entering Line 1.

While entrance into Line 1 has integrated the line, most of the better paying jobs are held by whites, although blacks hold three of six jobs rated JC 11 and the only job rated at JC 13. In the unusually attenuated Line 2, the bottom jobs are both rated below any job in Line 1 and the top job, a JC 7, outranks only one job in Line 1 and has a rating even with the next job.

## DISCRIMINATORY EFFECT AND THE APPLICABLE LAW

The case law interpretations of Title VII, 42 U.S.C. § 2000e et seq., make it clear that the equal-employment-opportunity-free-from-racial discrimination mandate of the statute is violated where it is shown that employees continue to suffer present adverse effects from racially discriminatory practices which pre-date the 1964 Civil Rights Act, Long v. Georgia Kraft Co., Bing v. Roadway Express Co., Robinson v. Lorillard Corp., United States v. Dillon Supply, Local 189 v. United States, supra, unless the present employment practices are justified by some independent business necessity which complies with Title VII. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Where the existing system preserves, renews, or exaggerates past discriminatory practices the Act is violated irrespective of the absence of present intent to discriminate, Griggs v.

Duke Power, supra at 432, 91 S.Ct. 849, or the presence of good intent and a good faith commitment to non-discrimination, Rowe v. General Motors, 452 F. 2d 348, 355 (5th Cir. 1972). Nor does the fact that the present system is the product of collective bargaining between an employer and a union which has met its statutory duty of fair representation[6] shield the employer, or the union from liability under Title VII. Peters v. Missouri-Pacific R.R. Co., 483 F.2d 490 (5th Cir., April 10, 1973, modified June 27, 1973); Heard v. Mueller Co., 464 F.2d 190 (6th Cir. 1972); and Norman v. Missouri-Pacific R.R. Co., 414 F.2d 73 (8th Cir. 1969); 42 U.S.C. § 2000e-2. The only explanation for this is that what is "fair" for the purposes of the Railway Labor Act and the National Labor Relations Act is not necessarily "lawful" or "equal" for the purposes of Title VII of the 1964 Civil Rights Act. The duty of fair representation doctrine was meant to provide some check on the contractual bargaining powers of the unions, yet, in the light of differing opinions and interest within heterogenous groups, still protect the union's collective decision where it exercised its discretion in good faith. Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), and Steele v. Louisville & N.R.R. Co., 323 U.S. 192, 203, 65 S.Ct. 226, 89 L.Ed. 173 (1944). The unlawful employment practices of 42 U.S.C. § 2000e-2 do not include a purpose to sanction good faith non-compliance where the *effect* of an employment practice is to deny *equal opportunity* in employment on account of race. See, Griggs v. Duke Power Co., supra, and Rowe v. General Motors, supra. Emphasis supplied.

## A. THE SENIORITY AND TRANSFER SYSTEM ESTABLISHED BY THE MAY 31, 1956 AGREEMENT

In applying Title VII and its decisional development to the seniority and transfer system presently in effect at Armco's Houston Works, we must determine first whether Armco and the Union have discriminated in the past. If so the next step is twofold: (1) Does the present policy perpetuate the past discrimination? (2) Is the present policy justified by a showing of business necessity? Bing v. Roadway Express, Inc., 444 F.2d 687, 690 (5th Cir. 1971).

From 1942 to the effective date of the May 31, 1956 Agreement, initial hiring and job assignment at the plant was segregated according to race with whites being assigned the better paying trade and craft jobs and blacks being assigned the lower paying labor jobs regardless of skill or experience and without any provision for transfer from one of these types of jobs to the other. All the evidence shows this and the Court has no difficulty in so finding.

An otherwise racially neutral seniority system predicated upon past hiring racial discrimination is an unlawful employment practice within the meaning of 42 U.S.C. § 2000e-2(a) and (c). Local 189 v. United States, 416 F. 2d 980, 988 (5th Cir. 1969). By conditioning advancement in Line 1, a line which prior to July 31, 1956 blacks could not enter, upon seniority earned in that line only[7] thus depriving black employees of seniority earned on jobs in a line to which they were relegated because of their race, the local working agreement of May 31, 1955, as amended,

6. The Railway Labor Act, 45 U.S.C. § 152, was construed to include such a duty in Steele v. Louisville & N.R.R. Co., 323 U.S. 192, 202–203, 65 S.Ct. 226, 89 L.Ed. 173 (1944). A similar statutory duty was held to be imposed by the National Labor Relations Act, 29 U.S.C. § 158(b), in Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

7. Under the contract seniority is only one of three criteria. Ability and physical fitness are the others. Agreement between Armco Steel Corporation and United Steelworkers of America, 13.1 (Aug. 1, 1968—Pltf. Ex. 19) (Aug. 1, 1971—Pltf. Ex. 45). However, the evidence from all parties was clear that the men and the Union regarded seniority as the controlling factor and required Armco to go to great lengths to show that a man was unable or unfit.

tied the existing seniority and transfer system to the past discriminatory practices and deprived black employees of their present right to be free from racial discrimination in employment. Local 189 v. United States, supra; Johnson v. Goodyear Tire & Rubber Co., 349 F. Supp. 3, 15 (S.D.Tex.1972). This is a violation of 42 U.S.C. § 2000e–2(a) and (c).

Additionally, black employees who entered the Structural Mill before October 26, 1964; the Electric Furnace before August 20, 1961; the Plate Mill before August 8, 1965, the Merchant Mill before June 6, 1966; the Rod Mill (now closed) before October 3, 1966; the Shipping Department before September 14, 1964; the Coke Plant before December 2, 1957; the Sintering and Ore Bedding Department before December 5, 1957; and the Roll Shop before November 19, 1962, have been and are discriminated against in a similar manner in that entrance into those departments remained racially discriminatory until those dates.[8] Depriving blacks of the use of Line 2 seniority for advancement in Line 1 where such seniority was earned in those departments before those dates operates to deprive blacks of present equal employment opportunities because of past racial discrimination in violation of 42 U.S.C. § 2000e–2(a) and (c). For the same reasons, the August 9, 1966, rebidding of the Structural Mill jobs and the October 1966 staffing of the #2 Electric Furnace and the 1970 absorption of Open Hearth employees into the Electric Furnace, all on the basis of line seniority deprived blacks who had earned Line 2 seniority prior to October 26, 1964, in the Structural Mill and August 20, 1961, in the Electric Furnace of equal employment opportunity because the rebidding was tied to a system (line seniority) which was based upon past racially discriminatory prac-

tices and therefore was an unlawful employment practice within the meaning of 42 U.S.C. § 2000e–2(a) and (c). The use of permanent assignments on the Ten Turn and Fifteen Turn level of operations in the Blooming Mill based upon Line 1 seniority is similarly violative of Title VII.

Where seniority and transfer provisions are found to perpetuate prior discriminatory practices, the "busin. necessity" exception means more th. hat the provisions serve legitimate management functions or business purposes. To fit the exception such provisions must be shown to directly foster safety and plant efficiency and must be essential to these goals. United States v. Bethlehem Steel Corp., 446 F. 2d 652, 662 (2nd Cir. 1971). There is a substantial safety factor involved where men are working with large cranes and other machinery in high temperatures moving molten metal and heavy steel products. However, the evidence is convincing that the danger to safety and efficiency is obviated by the fact that for the most part transferees enter the bottom jobs in Line 1 and move up as their training and experience allows. Any man who entered Line 1 would receive this kind of "orientation" regardless of how his seniority was computed. While, as defendants argued, Line 2 experience may not be directly relevant to the jobs in Line 1, it is equally clear that such related work experience is not detrimental. Former Line 2 workers, while not skilled in the fine points of a particular Line 1 job, would have reason to know of and appreciate the risks of the job. A man with Line 2 service advancing up Line 1 poses no greater threat to safety and efficiency than does a man who enters Line 1 directly as many men have done. If there is a particular or peculiar safety problem involved, then careful instruction and on-the-job training

---

8. In the "Numbers Game" discussion, supra, it was determined that entrance into the Blooming Mill, the Wire Mill (closed) and the Blast Furnace was non-discriminatory on and after July 31, 1956. No evidence was presented on the Nail Mill (closed) to show that discrimination in initial job assignments continued after the end of official segregation on July 31, 1956.

would be reasonably available alternatives. The testimony indicates that such "break-in" periods were utilized on some jobs, but that occasionally black employees experienced difficulty with white employees who were supposed to break them in but did not show them all the all the "tricks" of the job. In sum, the transfer and seniority system is not predicated upon business necessity. United States v. Jacksonville Terminal Co., 451 F.2d 418, 453 (5th Cir. 1971) and United States v. Chesapeake & Ohio Ry. Co., 471 F.2d 582, 588 (4th Cir. 1972).

The conclusion that the present, continuing operation of the system established by the 1956 Agreement is an unlawful employment practice is buttressed by the following factors:

(1) The tests, whether or not they were racially biased in purpose or content, operated to exclude large numbers of blacks from transferring to Line 1 and permitted them to be by-passed by younger black and white workers hired under the new systems; at least initially the tests applied to an exclusively black labor source; the elimination of the tests did not alleviate this effect since the Pre-Agreement black employees were already passed over and because of line seniority could not catch up;

(2) The effective notice system, which replaced the tests in designating who could transfer, also results in a skipping over of black personnel because once a particular temporary move-up is refused the notice is cancelled and the employee rendered ineligible for any future permanent openings;

(3) The failure to credit a man with Line 1 seniority for the time spent on a Line 1 job at Line 1 pay; if Line 1 experience is relevant to advance in Line 1 then service on such jobs, albeit temporary, ought to be credited towards advancement; where the remedial theory of the system was to turn to the "old" Line 2 blacks first, failure to grant this credit coupled with the cancellation of the effective notice for failure to take a

temporary opening operated to deter black employees from seeking such advancement.

## B. RATE RETENTION AND THE DUAL LINES OF PROGRESSION

### 1. Rate Retention

 Failure to accord "rate retention," that is paying a transferee to a lower job in the favored line the higher rate of his former job, has been held to be a term or condition of employment which discriminates against the affected class on account of race. United States v. Bethlehem Steel Corp., 446 F.2d 652 (2nd Cir. 1971); Clark v. American Marine Co., 304 F.Supp. 603, 608 (E.D.La. 1969); United States by Clark v. Local 189, 301 F.Supp. 906, 923 (E.D.La.1969) aff'd 416 F.2d 980 (5th Cir. 1969), cert. den. 397 U.S. 919, 90 S.Ct. 926, 25 L. Ed.2d 100 (1970). While employee jealousy and the threat which rate retention poses to an incentive plan are not by themselves reasons to avoid rate retention, it is an unusual remedy and must be "required by the exigencies of the situation as to take precedence over the other factors involved." Decision by the Secretary of Labor, In the Matter of Bethlehem Steel Corp., 5 EPD ¶ 5128 (1973) (hereinafter *Sparrows Point*). Since liability and remedy are being considered separately in the case at hand, the question here is whether the failure to provide for rate retention became an unlawful employment practice with the passage of Title VII.

 The wage rate paid to an individual employee in a bargaining unit job at Armco's Houston Works inures to him because of the job he occupies and the work he performs. The pay is determined by the job, not by the individual on the job. As noted by the Secretary in the *Sparrows Point* decision, and as the defendants' witnesses testified here, the pay and job classification system is uniform throughout the basic steel industry and was developed after systematic evaluation. Workers transferring from Line 2 to Line 1 might

sometimes suffer a cut in pay and therefore be discouraged from transferring. However while a worker might go to a lower job class he could receive more pay if his new lower rated job was an "incentive" job. The testimony and the exhibits also indicate that workers could transfer from Line 2 to jobs in Line 1 which had the same or higher job classification. An employee was not required to traverse to the top of Line 2 before he could go to Line 1. He could transfer as soon as he was the most senior man bidding for that particular opening in Line 1. While there was some disincentive to transfer, it was not pervasive, was not required in every case, and cannot be regarded as discriminatory in itself.[9] It was simply another alternative which a man had to weigh when making a career decision and determining his future preferences.

■ The problem in United States v. Bethlehem Steel Corp., supra, and in *Sparrows Point*, supra, was to devise a system which would induce transfers in plants which remained segregated even after the Civil Rights Act. As Judge Feinberg noted Bethlehem's employment practices at its Lackawanna Plant, which included lack of hiring standards, outright fraud, and openly discriminatory job assignments, were "reprehensible." 446 F.2d at 655. Here steps were taken long before the passage of Title VII to correct some of the abuses of the past. Here blacks could transfer to formerly "white only" lines although it was restricted, as early as 1956. The proof is in the pudding. Blacks did transfer despite the occasional pay-cuts, and unlike the "loss" of accrued Line 1 seniority the pay-cut hurdle was not a uniform condition of transfer. The failure to provide rate retention did not measurably tend to perpetuate past discrimination. Finally the failure to accord rate retention at the present time is justified by business necessity.

There are no identifiable "equities" or "exigencies" in the present situation on which to base rate retention. It would be unfair to other men, both black and white, performing the same labor and enduring the same conditions. It could play havoc with the incentive plan and cause a decrease in production.

### 2. The Dual Lines

■ The Plaintiffs also seek an order requiring the merger of the lines of progression in the departments made subject to this suit. Historically of course the lines have a racial connotation. But history alone does not render the lines violative of Title VII. See, Peters v. Missouri-Pacific R.R. Co., 483 F. 2d 490 (5th Cir. April 10, 1973, modified June 27, 1973); United States v. Jacksonville Terminal Co., 451 F.2d 418, 450 (5th Cir. 1971). The evidence here, and in *Whitfield*, indicates that historically the skilled and semi-skilled jobs (trade and craft) were grouped together and that the unskilled jobs (labor) were placed in another group. On top of these job-related groupings the Company and the Unions imposed a racially segregated system of hiring and promotion. Eventually a limited transfer system was established and segregated hiring into the plant ceased. Gradually the transfer system became less restricted. The jobs in Line 1 for the most part are skilled jobs which *inter alia* require employees to be able to gauge temperatures and strengths of steel; to control the heat of furnaces by adjusting the mix of air, natural gas, electricity, and raw materials; to manipulate complex machinery such as cranes, rollers and tilt tables, which manuever pieces of steel weighing hundreds of pounds into position at great speeds and then to guide them through a shaping process. There is great risk attendant in these jobs of ruining equipment and products and endangering the lives of men. Generally

---

9. Cf., *Sparrows Point*, 5 EPD ¶ 5128 pp. 3255–3256, where the Secretary held that "requiring employees who wish to transfer to seniority units from which they were previously ex-cluded on the basis of race to suffer a reduction in pay as a condition of transfer is in itself discriminatory."

speaking, the jobs are interrelated, and progression up the line is in a logical sequence with each job providing training and experience relevant to the next job up the line. There are some instances where the job interrelationship is not as strong, but where the jobs have been linked because of geographic proximity.

The jobs in Line 2 bear similar relationships with each other. These jobs are not however as skilled or complex in content as the jobs generally found in Lines 1. They require the handling of bulk products and materials, the marking of products, the hooking and unhooking of cranes, the maintenance of fires in furnaces, etc. Some of these tasks are auxiliary to Line 1 tasks, others are independent. While they do not approach the complexity of Line 1 tasks, Armco's assistant works manager (personnel manager) Terry Hudson testified that the high job classification of some Line 2 jobs is on account of the essential nature of the task performed, not its complexity or simplicity, and the training and experience of the man performing that task. One advantage to the dual line system for less skilled persons is that it permits them to advance upon higher paying jobs without overmatching themselves upon intervening skilled jobs. Persons who lack the necessary physical or mental skills to perform complex tasks and are either unwilling or unable to be trained for them can still achieve a measure of job satisfaction and monetary reward for the development of the talents which they do possess. In this limited sense the dual line system serves a necessary social and industrial purpose.

 The dual lines themselves are not violative of 42 U.S.C. § 2000e–2(a) and (c), and insofar as they have contributed to racial discrimination in employment opportunity in violation of

that section that contribution has been lessened by the transfer provisions, and can be lessened further by reforms which will place the transfer and seniority system in compliance with Title VII. The lines of progression promote safety and efficiency by insuring job related training and job familiarity. While other configurations of the jobs and lines could no doubt be arranged, the line concept itself is a valid one, reasonably related to legitimate business purposes and "essential" to their attainment within the meaning of United States v. Bethlehem Steel, 446 F.2d at 662, and Local 189 v. United States, 416 F.2d at 989. Merger of the lines would give some Line 2 employees more direct avenues to higher paying jobs, but at a risk to safety and production resulting from the melding of unrelated tasks. Since the transfer system provides a reasonable alternative for introducing Line 2 personnel into Line 1 and training them for highly paid skilled jobs, merger is unnecessary. Employees can transfer from any level in Line 2 to the starting jobs in Line 1.[10] It is possible under some circumstances for new employees to bypass Line 2 entirely and enter Line 1. Taken together these two facts indicate that Line 2 service, while of some value in Line 1, is not essential to advancing within Line 1.

There are two departments to which these statements do not apply. One is the Wire Mill which is now shut down. As noted above in the discussion of the racial composition of the Wire Mill, the jobs were so similar that there was no earthly reason why they should have remained separated after the 1956 Agreement except as an inertial hangover of segregation. The same is true of the Roll Shop, where Line 2 consists of only three men, and the absorption of these men and their jobs into Line 1 would pose no danger to safety or efficiency.

10. From the testimony adduced at the hearing, it is clear that entrances are not always made into *the* bottom job. The entering or transferring employee takes the lowest job opening in Line 1 to which incumbent Line 1 employees refuse to promote. The testimony produced numerous instances of employees who are quite comfortable on the bottom job, consistently refuse promotions, and are therefore constantly passed over by workers entering the line.

Within the scope of the dual lines there remains the case of Plaintiff-intervenor, Alfred James, a Line 2 employee in the now defunct Open Hearth. In 1956, he held the job of switchman and wished to enter Line 1 to take the job of engineer directly, skipping over the jobs ranked below engineer in Line 1 of the Open Hearth. The reason given by Armco for separating a locomotive engineer and a locomotive switchman was that the engineer had to work closely with crane operators in loading and unloading his cargo. Therefore his job was placed in the crane line of progression. This is a valid reason for placing the engineer's job in with the crane jobs, but it does not explain why the switchman's job remained segregated from it. If it was the fear that a switchman such as James would be unable to perform the tasks of a craneman in the event of a promotion or lay-off, the answer is simple and is found in the collective agreement. If he lacked the ability to perform such jobs safely and efficiently, he could not promote to them or fall back upon them. The local agreements concerning lines of progression are replete with provisions for particularized treatment of certain individuals. The record does not disclose a valid business reason why the switchman's job could not have been relocated below the engineer's job in Line 1 with special provision made for the promotion or reduction of the incumbent James. It was a job which was open and which James could perform, but upon which he had been precluded from advancing because of his race. Failure to accord this treatment after the effective date of the 1964 Civil Rights Act became an unlawful employment practice within the meaning of 42 U.S.C. § 2000e–2(a) and (c).

## LIABILITY

The unlawful employment practices which have been found to exist at Armco's Houston Works are the products of the interplay of history, the Master Agreement between Armco and the International, and the local working agreements between Armco and the Local governing lines of progression, seniority and transfer rights, especially the May 31, 1956 Agreement. As in Rowe v. General Motors, the Defendants here have acted with high purpose to do the best they could to rid themselves of racial discrimination in employment opportunities. However, they have fallen short, and since their conduct was purposeful, was rooted in part on past discriminatory practices, and has had racially-determined effects, their conduct individually and collectively was "intentional" within the meaning of 42 U.S.C. § 2000e–5(g) authorizing injunctive relief, and the Defendants are liable to respond to the Plaintiffs and their class for the unlawful practices. Local 189 v. United States, 416 F.2d 980, 996 (5th Cir. 1969).

The International contends that it cannot be held liable because it did not authorize or ratify any acts of the Local, and further that it was not named as a respondent in any charge filed before the EEOC. These contentions are rejected. Section 2.5 of the Master Agreement between Armco and the International authorizes local working agreements like the ones in issue here. Pltfs. Ex. 19 and 45. There was evidence that officials of the International knew of the August 9, 1966 Agreement, and that one signed it. The authorization of such local agreements and the failure to adequately police them satisfies the requirements of 29 U.S.C. § 106 and renders the International liable for the effects engendered by the local agreements. The Local as an agent of the International was named as a respondent in the EEOC charges here, and is an adequate representative of the International's interests. See, United States v. Chesapeake and Ohio Ry. Co., 471 F.2d 582, 592 (4th Cir. 1972). Even if the Court is mistaken in this regard, it is clear as stated in the C & O case that the International could be added as a party even at this late date if necessary to effectuate the decree of re-

lief. *Id.*, at 593, citing Griffin v. County School Bd., 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). Furthermore, since the unlawful practices found here affect the right of Plaintiffs and their class to contract for employment, and since the discriminatory practices are found in or authorized by the collective bargaining agreement for which the International shares responsibility, the practices are violative of the Civil Rights Act of 1866, 42 U.S.C. § 1981. Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971) cert. den. 405 U.S. 916, 92 S.Ct. 931, 30 L.Ed.2d 785 (1972); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970), cert. den. 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971); Johnson v. Goodyear Tire & Rubber Co., 349 F.Supp. 3 (S.D.Tex. 1972). A failure to present a claim to the EEOC does not deprive a federal court of jurisdiction where the complaint also embodies a cause of action under 42 U.S.C. § 1981. Hill v. American Airlines, Inc., 479 F.2d 1057 (5th Cir. 1973); Caldwell v. National Brewing Co., supra; and Sanders v. Dobbs Houses, Inc., supra.

## SOME THOUGHTS ON REMEDY

As noted, the liability and remedy phases of this litigation are being handled separately. However, it seems appropriate to record some thoughts on remedies at this time.

■ It is clear that Line 2 blacks who suffered from segregated hiring or channelling in the enumerated departments must be accorded the benefit of their Line 2 service, that is "departmental seniority," when competing with their contemporaries in Line 1. United States v. Chesapeake & Ohio Ry. Co., 471 F.2d 582, 589 (4th Cir. 1972); United States v. St. Louis-San Francisco Ry. Co., 464 F.2d 301, 308 (8th Cir. 1972); and United States v. Jacksonville Terminal Co., 451 F.2d 418, 458 (5th Cir. 1971).

■ Some employees may be entitled to back pay, e. g., Alfred James and employees who served in closed departments. If so, they will be limited in time to the period provided in state law for the recovery of wages. Vernon's Ann.Texas Civ.Ct. Art. 5526 § 4; see, United States v. Georgia Power Co., 474 F.2d 906, 923 (5th Cir. 1973); Beard v. Stephens, 372 F.2d 685, 688 (5th Cir. 1967). Employees seeking back wages will have to meet the test set out in *Georgia Power* at page 922 of 474 F.2d. It may be that some of these employees would prefer a form of seniority credit instead of monetary recovery, assuming of course that an appropriate formula can be devised. The parties may wish to consider a wholesale revision of seniority computation and base it upon department service only for all employees; or plant service only for all employees; or department service for promotion and plant service for layoffs; or a form that would award points for plant, department, line, and job service, and base seniority on the total. While the dual line system has not been found to be unlawful, the parties may wish to see if they can devise a method to promote and demote from certain jobs in Line 2 to allied jobs in Line 1. These are of course "thoughts," but a little imagination now may save us all some work later on.

Righting the wrongs of history is never an easy task. It might be that the inexorable law of societies is that we do reap what we sow. It might be that the sins of the fathers are visited upon the children to the third and fourth generations. It might be that if Wilberforce had been born one hundred years earlier this case would not be here. Be that as it may, the case is here and some remedy must be provided—every wrong should have a remedy.

## INTERLOCUTORY APPEAL

In the event the Court has misapplied the law to these facts, and since the remedy phase is separate, then to avoid possibly unnecessary hearings on remedy the Court certifies in accordance with 28 U.S.C. § 1292(b) that today's decision on liability involves a controlling ques-

tion of law as to which there is substantial ground for difference of opinion and that an immediate appeal will materially advance the ultimate termination of this litigation. Any party may apply for an interlocutory appeal if they so desire.

It is therefore ordered, adjudged and decreed that the Defendants be held liable to the Plaintiffs and the class they represent for the acts and omissions determined herein to be unlawful employment practices within 42 U.S.C. § 2000e–2(a) and (c), and for no other. Costs, attorney's fees, and injunctive relief to abide the hearing on remedy.

## APPENDIX A.

### AGREEMENT AMENDING THE SENIORITY PROVISIONS COVERING EMPLOYEES OF THE HOUSTON PLANT OF SHEFFIELD STEEL

It is agreed that the seniority provisions and practices now in effect at the Houston Plant of Sheffield Steel shall be amended as follows:

1. The present Extra Board will be eliminated sixty (60) days after date of signing of this Agreement. At the end of the sixty (60) day period Extra Board employees will be transferred to the Yard and Track Labor Department, and new employees, except apprentices, will be hired into the Yard and Track Labor Department.

2. Present lines of progression shall continue in effect. Promotions within a line of progression shall be based on seniority in that line.

3. Layoffs (except disciplinary) in a department shall be handled as follows:

 A. During the first seven (7) calendar days, employees laid off may exercise their plant seniority in the Yard and Track Labor Department.

 B. After the first seven (7) calendar days of a layoff, employees displaced from a No. 1 Line of Progression will be permitted to exercise their departmental seniority in the No. 2 Lines of Progression, after which, all displaced employees from the No. 1 and No. 2 Lines of Progression shall exercise their plan seniority in the Yard and Track Labor Department.

 C. Layoffs of any duration from the Yard and Track Labor Department will be based on plant seniority.

4. Openings on starting jobs in No. 2 Lines of Progression in a department, except openings involving callbacks of employees with seniority in the department, will be filled by employees from the Yard and Track Labor Department solely on the basis of plant seniority.

5. Openings on starting jobs in No. 1 Lines of Progression in a department, except openings involving callbacks of employees with seniority in the department, will be filled as follows:

 A. By promotion of an employee in a No. 2 Line of Progression in that department on the basis on his departmental seniority provided such employee has passed the Company's tests.

 B. If the opening is not filled as provided in "A" of this Section, by promotion of an employee from the Yard and Track Labor Department on the basis of his plant seniority provided such employee has passed the Company's tests.

 C. Notwithstanding the provisions of Section 1 above, if the opening is not filled as provided in "A" or "B" of this Section, by hiring a new employee who meets the Company's pre-employment standard and who passes the Company's tests.

 D. The method in filling openings as provided in Paragraphs "A" and "B" of this Section shall not become effective until sixty (60) days after date of signing of this Agreement. During this sixty (60) day interval any openings that occur will be filled in accordance with the practices heretofore in effect or as provided in Paragraph "C" of this Section.

6. The Company will give tests as follows:

A. Any present employee not now in a No. 1 Line of Progression will be eligible to take the tests, if he so desires. All such employees shall notify the Company in writing of their desire to take the tests within twenty (20) days after date of acceptance of this Agreement and such employees will be given the tests within forty (40) days thereafter.

B. Any employee hired hereafter will be required to take the tests.

C. An employee who elects not to take the tests during the twenty (20) day period may request and take the tests after the lapse of six months. An employee who fails to pass the tests may retake the tests after the lapse of six months.

D. The content of all tests and the minimum passing grades will be determined solely by the Company. Upon request the results of an employee's tests will be open for inspection by the employee with or without the President or Chairman of the Plant Grievance Committee present, as he may elect.

7. Wherever the word "seniority" is used in this Agreement (whether used alone or with a descriptive adjective), it shall be deemed to mean seniority as defined in the Basic Collective Bargaining Agreement.

8. The provisions of this Agreement shall supersede and replace all previous seniority provisions and practices that are contrary to the provisions of this Agreement.

ACCEPTED: May 31, 1956

UNITED STEELWORKERS OF AMERICA
On Behalf of Local Union No. 2708

*[signatures]*

SHEFFIELD STEEL
Division
Armco Steel Corporation
Houston, Texas

*[signatures]*

## APPENDIX B.
## AMENDMENT

**TO THE MAY 31, 1956 AGREEMENT**

The Agreement Amending the Seniority Provisions Covering Employees of the Houston Plant of Sheffield Steel dated April 24, 1956, commonly called "The May 31st Agreement is hereby amended as follows:

Section 5 is deleted and there is substituted therefor:

5. Openings on starting jobs in No. 1 Lines of Progression in a department will be filled as follows:

A. *Permanent Openings:*

(1) By call back of an employee based on seniority in such Line, but if not so filled,

(2) By promotion of an employee in a No. 2 Line of Progression in that department who has an effective notice on file pursuant to Paragraph 6B, based on his departmental seniority, but if not so filled,

(3) By promotion of an employee from the Yard and Track Labor Department (Labor Pool) on the basis of his plant seniority, but if not so filled,

(4) By the Company in any manner that does not violate the Bargaining Agreement.

B. *Extended Vacancies:*

(1) In the manner provided by the Extended Vacancy Agreement dated July 12, 1962, but if not so filled,

(2) Then in the manner hereinafter provided for the filling of Temporary Vacancies.

C. *Temporary Vacancies:*

(1) By call back from the Labor Pool or the No 2 Line in the same department of the employee working on the same turn with the greatest seniority in the Line in which such vacancy occurs, but if not so filled,

(2) By the employee working on the same turn in a No. 2 Line in the same department based on departmental seniority who has an effective notice on file with the Company that he will accept such vacancies, but if not so filled,

(3) By assignment of the employee working on the same turn in the Labor Pool who has the greatest departmental seniority in the department in which the vacancy occurs, but if not so filled,

(4) By an employee from the Labor Pool on the same turn on the basis of his plant seniority.

Section 6 is deleted and the following. is substituted therefor:

6. GENERAL PROVISIONS:

A. Nothing in this Agreement shall limit, impair or affect the Company's hiring prerogatives.

B. On or before ten (10) days prior to the beginning of each calendar quarter, a No. 2 Line employee who desires to fill extended or temporary vacancies or permanent openings in any No. 1 Line in his department shall give the Company written notice to the effect that he will fill temporary vacancies, and such notice shall become effective the first scheduled workweek which commences in such ensuing calendar quarter. Such notice shall remain in effect until the second scheduled workweek following the week in which such notice is revoked by written notification filed with the Company. A notice filed in one department shall not be applicable in any other department.

C. If a No. 2 Line employee does not have on file an effective notice

that he will accept Temporary Vacancies in the No. 1 Line in his department, such employee will not be eligible to promote into or take any extended or temporary vacancy or any permanent opening in such No. 1 Line unless he holds seniority in such No. 1 Line. The company shall to the greatest degree, consistent with the efficiency of the operations and the safety of the employees, fill Temporary Vacancies as hereinabove provided and the employees must accept and fill such vacancies to which they are so assigned.

D. An employee who fills an Extended or Temporary Vacancy shall receive the job rate for the job so filled.

E. A No. 2 Line employee shall not establish No. 1 Line seniority while filling an Extended or Temporary Vacancy in such No. 1 Line.

F. Reductions in force and promotions in a No. 1 Line shall be based on seniority in that Line.

G. Except as expressly changed by this Agreement, the May 31st Agreement and its construction heretofore established shall remain in effect.

H. Nothing herein contained shall enlarge or diminish the rights of the Company either to determine whether or not a vacancy will be filled or whether or not to fill a vacancy by double over.

Section 4 is amended only as follows:

Prior to a temporary vacancy in a No. 2 Line being filled on the basis of plant seniority, the employee in the Labor Pool working on the turn who has no seniority in such Line but has the greatest departmental seniority in such department will fill such temporary vacancy.

DATED: *March 1, 1964*

United Steelworkers of America
On Behalf of Local Union No. 2708

*Jim Smith*

*Roy Vanya*

*E. A. Speight*

*E. H. Nelson*

*John O. Holloway*

*J. W. Duncan, Jr.*

*George Curtis*

Sheffield Division
Armco Steel Corporation
Houston, Texas

*W. M. Rankin*

*H. A. Marshall*

# ARMCO STEEL CORPORATION
STEEL DIVISION

H. A. MARSHALL
ASSISTANT TO MANAGER
HOUSTON WORKS

ADDRESS REPLY TO
P. O. BOX 1367
HOUSTON, TEXAS 77001

Certified Mail #554007
Return Receipt Requested

March 11, 1965

Mr. J. W. Smith, Staff Representative
United Steelworkers of America
12821 Industrial Road
Houston, Texas 77015

Dear Mr. Smith:

Subject: Letter of Understanding Concerning the Amendment to the
May 31, 1956 Agreement Dated March 1, 1964

In order to allow employees who bid or who are forced on permanent job openings in a No. 2 Line of Progression in a department, earlier than ten days prior to a calendar quarter or following the start of a calendar quarter, to fill extended vacancies or temporary vacancies or permanent openings in any No. 1 Line in such department, the Company and Union agree to add the following to paragraph B of Section 6 - General Provisions of the above mentioned Agreement:

In the event an employee is the successful bidder or is forced on a permanent job opening occurring on a starting job in a No. 2 Line of Progression, and in the event such employee desires to fill extended or temporary vacancies or permanent openings in any No. 1 Line in such department, he shall give the Company written notice within ten days after entering the department to the effect that he will fill temporary vacancies, and such notice shall become effective the first scheduled workweek which commences following such written notice. Such notice shall remain in effect until the second scheduled workweek following the week in which such notice is revoked by written notification filed with the Company. A notice filed in one department shall not be applicable in any other department. ARMCO

If this letter correctly sets forth our understanding concerning this matter, please sign two copies of this letter and return them to me.

Yours very truly,

*H. A. Marshall*

H. A. MARSHALL
Assistant to Works Manager

APPROVED: *Jim Smith E. A. S.*
JIM SMITH, Staff Representative
United Steelworkers of America

HAM:en

cc: Messrs. Claude Baldree, President
E. A. Speight, Grievance Chairman
Local Union No. 2708